# INTERNATIONAL NAVIGATION COMPANY *v.* FARR AND BAILEY MANUFACTURING COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 193. Argued March 12, 13, 1901.—Decided April 22, 1901.

The Harter act, so-called, does not relieve the ship owner from liability for damages caused by the unseaworthy condition of his ship at the commencement of her voyage.

Nor is the ship owner exempted from liability under that act, "for damage or loss resulting from faults or errors of navigation, or in the management of said vessel," unless it appears that she was actually seaworthy when she started or that the owner had exercised due diligence to make her so in all respects.

The mere fact that the owner provides a vessel properly constructed and equipped is not conclusive that the owner has exercised due diligence within the meaning of the act, for the diligence required is diligence on

the part of all the owner's servants in the use of the equipment before the commencement of the voyage and until it has actually commenced; and the law recognizes no distinction founded on the character of the servants employed to accomplish that result.

Whether a ship is reasonably fit to carry her cargo is a question to be determined on all the facts and circumstances, and the difference in the facts of this case from those in *The Silvia,* 171 U. S. 462, was such that the Court of Appeals was at liberty to reach a different result.

THIS was an action brought by the Farr and Bailey Manufacturing Company against the International Navigation Company, owner of the steamship Indiana, in the District Court of the United States for the Eastern District of Pennsylvania, in admiralty, to recover the sum of $2084.15, for damages to twenty bales of burlaps which were delivered to the Navigation Company at Liverpool, England, on board that steamship, in good order and condition, for carriage to the Manufacturing Company at Philadelphia. Upon the arrival of the steamship at Philadelphia the burlaps were found to have been damaged by sea water. The case was heard in the District Court and the libel sustained, and the cause referred to a commissioner to determine the extent of the loss. 94 Fed. Rep. 675. The Navigation Company applied for a reargument, which was had, and thereupon the libel was dismissed. 94 Fed. Rep. 678. From this decree the Manufacturing Company appealed to the Circuit Court of Appeals for the Third Circuit, and that court, one of its members dissenting, reversed the decree of the District Court, and held the Navigation Company liable. 98 Fed. Rep. 636. The case was then brought to this court on certiorari.

In the first opinion of the District Court it was stated that—

"In May, 1895, twenty bales of burlaps in good condition were received by the vessel at Liverpool, consigned to the libellant, in Philadelphia, and a bill of lading was given therefor. The bales were stowed with some other goods in compartment No. 3 of the lower steerage deck; but the compartment was not full, only one tier of cargo, two or three feet high, covering the floor, so that access to the ports was very easy and unobstructed. Four or five days after the vessel left Liverpool water was discovered in the compartment; and when the hatches were opened, a day or two later, it was found that the after

port on the starboard side was admitting water freely as the vessel rolled. Both covers of the port were unfastened and open, but there was no sign of injury to either, or to the surroundings of the port. No severe weather had been encountered, and no accident was known to have happened to the vessel. The ports in the compartment were inspected the day, before the vessel sailed, and were believed to be closed; but several hours elapsed between the time of inspection and the time of sailing. The libellant's burlaps were injured by the water thus taken into the ship, and the present suit has been brought to determine the respondent's liability."

"We have little difficulty in coming to the conclusion that the vessel was a staunch boat, properly manned, equipped, and supplied, and that she was in all respects fit for the voyage, except in the one respect of which the libellant complains,— the condition of the after port on the starboard side in compartment No. 3."

And it was found " as a fact, that the port in question was either not fastened at all, or was insecurely fastened, when the vessel left Liverpool."

In the second opinion it was said:

"It seems to me that, although the owners of the vessel provided the proper equipment for the porthole under consideration, and although the failure to close it properly was due to negligence in the use of such equipment, nevertheless the result was unseaworthiness, because the vessel set sail with a hole in her side that was not only unknown to her officers, but was believed not to exist. She was, therefore, not in a condition to afford due protection to the cargo in this particular compartment. If the hole had been caused by collision while she lay at her berth, and she had been sent upon her voyage without repair, it could not be successfully asserted that she was seaworthy, although the proper tools and materials might have been among the ship's stores, and the failure to repair might be properly said to have been due to negligence in failing to use the equipment at hand."

The Circuit Court of Appeals said that—

"These goods were stowed in a compartment on the lower

steerage deck in such manner as to admit of free access being had to the port through which the water subsequently entered. This port, and others similarly situated, were inspected on the day before the vessel sailed, and they were believed to be closed and properly fastened; but, after the Indiana had proceeded for four or five days upon her voyage, water made its appearance in the compartment, and a day or two later investigation disclosed that both the glass cover and the iron dummy of the port in question were open, and that through this opening the water was admitted. There had been no severe weather, no accident was known to have happened, and the port, its covers, fastenings, and surroundings, did not appear to have been in any way broken or impaired."

And found as to the port:

"The impression made upon us by the evidence is that it was probably closed, but, be this as it may, certain it is that it was not securely fastened; and we are of opinion that, by reason of this fact, the vessel was unseaworthy."

*Mr. J. Rodman Paul* for petitioner.

*Mr. John F. Lewis* for respondent. *Mr. Horace L. Cheyney* was on his brief.

Mr. CHIEF JUSTICE FULLER, after stating the case as above, delivered the opinion of the court.

Counsel for petitioner states that the question raised on this record is: "Was the Indiana unseaworthy at the time of beginning her voyage from Liverpool to Philadelphia, or was the failure to securely fasten the port covers and keep them fastened a fault or error in the management of the vessel under the exemption of the 'Harter act?'"[1]

---

[1] Act of February 13, 1893, 27 Stat. 445, c. 105, entitled "An act relating to navigation of vessels, bills of lading, and to certain obligations, duties, and rights in connection with the carriage of property." The first, second and third sections read:

"Be it enacted by the Senate and House of Representatives of the United

The courts below concurred in the conclusion that the Indiana was unseaworthy when she sailed because of the condition of the port hole, but the District Judge on the reargument felt constrained to yield his individual convictions to the rule he understood to have bec.a laid down in *The Silvia*, 171 U. S. 462.

*The Silvia* was decided, as all these cases must be, upon its particular facts and circumstances. The case is thus stated by Mr. Justice Gray, who delivered the opinion of the court:

"The Silvia, with the sugar in her lower hold, sailed from

---

States of America in Congress assembled, That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

"Sec. 2. That it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence, properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in anywise be lessened, weakened, or avoided.

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

Matanzas for Philadelphia on the morning of February 16, 1894. The compartment between decks next the forecastle had been fitted up to carry steerage passengers, but on this voyage contained only spare sails and ropes, and a small quantity of stores. This compartment had four round ports on each side, which were about eight or nine feet above the water line when the vessel was deep laden. Each port was eight inches in diameter, furnished with a cover of glass five eighths of an inch thick, set in a brass frame, as well as with an inner cover or dummy of iron. When the ship sailed, the weather was fair, and the glass covers were tightly closed, but the iron covers were left open in order to light the compartment should it become necessary to get anything from it, and the hatches were battened down, but could have been opened in two minutes by knocking out the wedges. In the afternoon of the day of sailing, the ship encountered rough weather, and the glass cover of one of the ports was broken—whether by the force of the seas or by floating timber or wreckage, was wholly a matter of conjecture—and the water came in through the port, and damaged the sugar."

And again:

" But the contention that the Silvia was unseaworthy when she sailed from Matanzas is unsupported by the facts. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. The port holes of the compartment in question were furnished both with the usual glass covers and with the usual iron shutters or dead lights; and there is nothing in the case to justify an inference that there was any defect in the construction of either. When she began her voyage, the weather being fair, the glass covers only were shut, and the iron ones were left open for the purpose of lighting the compartment. Although the hatches were battened down they could have been taken off in two minutes, and no cargo was stowed against the ports so as to prevent or embarrass access to them in case a change of weather should make it necessary or proper to close the iron shutters. Had the cargo been so stowed as to require much time and labor to shift or remove it in order to get at the ports, the fact

that the iron shutters were left open at the beginning of the voyage might have rendered the ship unseaworthy. *But as no cargo was so stowed, and the ports were in a place where these shutters would usually be left open for the admission of light, and could be speedily got at and closed if occasion should require, there is no ground for holding that the ship was unseaworthy at the time of sailing.*"

In the present case the compartment in which the burlaps were stowed was used exclusively as a cargo hold; the glass and iron covers were intended to be securely closed before any cargo was received; the person whose duty it was to close them or see that they were closed, supposed that that had been properly done; and the hatches were battened down with no expectation that any more attention would be given to the port covers during the voyage; but in fact the port was not securely covered, and there was apparently nothing to prevent the influx of water, even under conditions not at all extraordinary, the port being only two or three feet above the water line.

We are of opinion that the difference in the facts between the two cases was such that the Court of Appeals was at liberty to reach a different result in this case from that arrived at in *The Silvia*. The latter decision simply demonstrated the justness of Lord Blackburn's observation in *Steele* v. *State Line S. S. Co.*, L. R. 3 App. Cases, 72, that the question whether a ship is reasonably fit to carry her cargo must be "determined upon the whole circumstances and the whole evidence."

On the question of fact in this case, we have the concurrent decisions of the two courts that the Indiana was unseaworthy at the commencement of the voyage, and as we find no adequate ground to conclude that the finding was erroneous, the settled doctrine that it should be accepted is applicable. *The Carib Prince*, 170 U. S. 655.

But it is contended that in spite of the fact that the condition of the port hole rendered the ship unseaworthy when she sailed, the omission to securely cover it was a fault or error in management and within the exemption of the third section of the Harter act. The proposition is that if the owner provides a vessel properly constructed and equipped, he is exempted from lia-

bility, no matter how unseaworthy the vessel may actually be, at the commencement of the voyage, through negligent omission or commission in the use of the equipment by the owner's servants. Or, to put it in another way. If the unseaworthiness is not the result of error or fault in management, the third section does not apply, and even if it were, the exemption still cannot obtain unless it appears that the owner used due diligence to make the vessel seaworthy. And it is said that the owner does exercise such diligence by providing a vessel properly constructed and equipped, and that while he is responsible for the misuse or nonuse of the structure or equipment by his "shore" agents, he exercises due diligence by the selection of competent "sea" agents, and that he is not responsible for the acts of the latter, although they produce unseaworthiness before the commencement of the voyage.

We cannot accede to a view which so completely destroys the general rule that seaworthiness at the commencement of the voyage is a condition precedent, and that fault in management is no defence when there is lack of due diligence before the vessel breaks ground.

We do not think that a ship owner exercises due diligence within the meaning of the act by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship *in all respects* seaworthy, and that, in our judgment, means due diligence on the part of all the owners' servants in the use of the equipment before the commencement of the voyage and until it is actually commenced.

The ruling in *Dobell & Co.* v. *Steamship Rossmore Co.*, (1895) 2 Q. B. 408, is in point. The Rossmore left Baltimore with a port improperly caulked, which rendered the vessel unseaworthy, through the negligence of the ship's carpenter, who was a competent person. Sea water entered through this port and damaged the cargo. The bill of lading incorporated the Harter act by reference, and it was held, as correctly stated in the syllabus, that " to exempt the ship owner from liability it was not sufficient merely to shew that he had personally exercised due diligence to make the vessel seaworthy, but that it must be shewn that those persons whom he employed to act for him in

this respect had exercised due diligence;" and that, therefore, the negligence of the ship's carpenter prevented the exemption from applying, and the ship owner was liable.

The obligation of the owner is, in the language of section two of the act, "to exercise due diligence, to properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage;" and that obligation was not discharged when this vessel sailed with a hole in her side, under the circumstances disclosed, whether the duty of seeing that it was closed devolved on officers of the ship, or the foreman of the stevedores, or on all of them. The obligation was to use due diligence to make her seaworthy before she started on her voyage, and the law recognizes no distinction founded on the character of the servants employed to accomplish that result.

We repeat that even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions. The word "management" is not used without limitation, and is not, therefore, applicable in a general sense as well before as after sailing.

It is, of course, not to be understood as intimated that failure to close port holes necessarily creates unseaworthiness. That depends on circumstances, and we accept the finding of the District Court, and of the Court of Appeals, that it did so under the circumstances of this case.

Nor do we say that the liability rests alone on the ignorance of the officers that the port covers were not securely fastened. This is not a case where it appears that the port would ordinarily have been left open, to be closed as the exigency might require, and where failure to close it during the voyage might be an error or fault in management. The importance of this point is well illustrated by Dallas, J., in the Court of Appeals, thus: "But in the present case the port in question was not designedly left open, and its shutters ought not to have been left unfastened. They would not 'usually be left open for the

admission of light,' or for any purpose. They were believed by all concerned to have been securely closed, and that they would remain so throughout the voyage. It was neither intended nor expected that they would require or receive any attention at sea. It was not supposed that any control of them in the course of navigation and management would be necessary, and no du r to exercise control existed, simply because no need nor occasion for it could have been foreseen or perceived."

*Decree affirmed.*