## THE ABBAZIA.

(District Court, S. D. New York. January 7, 1904.)

1. SHIPPING—CARGO BURNED AS FUEL—LIABILITY OF SHIP BECAUSE OF UNSEAWORTHY CONDITION.

Evidence *held* to establish that the failure of a steamship to make her normal speed in a voyage across the Atlantic, and her increased consumption of coal, by reason of which her supply was exhausted and she burned a part of the cargo, was due to her weak and defective boilers, which were 18 years old and leaked, and the foul condition of her bottom, which had not been cleaned for an unusual length of time, which rendered her liable for the cargo consumed, notwithstanding the fact that she obtained surveyors' certificates of seaworthiness at the beginning of the voyage

In Admiralty.

Black & Kneeland, for libellants.

Ullo & Ruebsamen, for claimant.

ADAMS, District Judge. These actions were brought by the respective libellants, the Ford Morocco Company and Emanuel S. Kuh, to recover the value of about 60 bales of goat skins and 60 packages of tallow, parts of larger lots delivered by them to the steamship Abbazia, in Trieste in January, 1902, for transportation to New York.

The steamship was running in a regular line from Mediterranean ports to New York, thence to Tampa, Florida, New Orleans, Baltimore and back to Trieste. On this occasion, she left Trieste on the 17th of January and called at Girgenta, Messina and Algiers. She left the latter place on the 4th of February at 4 A. M. with 600 tons of coal in her bunkers. Her regular speed, in favorable weather, was from 200 to 205 knots per day on a consumption of about 22½ tons. The distance from Algiers to New York is 3,800 miles and upon an ordinary rate of progress, the voyage would occupy from 19 to 20 days, under favorable conditions. The steamship made her full speed on one day only, the first day out from Algiers, up to the 27th of February, when she was obliged to bear away for Bermuda to renew her coal supply, it being then exhausted, excepting 96 tons. In proceeding to Bermuda she used up the remnant of her supply, excepting about 4 tons, and burned her fittings and the cargo in question. Having obtained a new supply of 169 tons of coal in Bermuda, she continued her voyage on the 9th of March, and reached New York on the 15th of March, with 47 tons in her bunkers.

The libellants contend that the prolongation of the voyage was due to unseaworthiness of the vessel when she started, in that her boilers

were leaking, on account of the defective and corroded condition of parts of the combustion chambers, aggravated by the unclean condition of the ship's bottom.

The claimant contends that the delay was owing to the perils of the seas, due to strong head winds, lasting for over a month, so that the provision she had made for 26 or 27 days steaming, was exhausted in about 20 days, creating the necessity for the deviation and the new supply. That, therefore, the case is one of general average.

The testimony shows that the vessel was delayed by the leaky condition of her boilers before she reached Algiers, but the claimant insists that if a defect had existed before sailing from Trieste, it would have been discovered there, because an examination was made of the vessel by surveyors of the London Lloyds, the Austrian Veritas and Austro Hungarian Government, who issued their certificates to the vessel to the effect that she was sound, staunch and fit for the voyage.

After passing Gibraltar, almost constant trouble was had with the boilers, principally the one on the starboard side. They leaked, causing detention, and although there was some heavy weather, it does not satisfactorily appear that the weather was the cause of any material delay. The weather was not more severe than should have been expected at the season of the year and provided against. In any event, it did not affect the boilers. There were some defective and corroded plates in them, which were removed after reaching New York. The boilers were at least 18 years old and had become generally thin and weak. They could not be inspected satisfactorily in Trieste. Some attempt was made to examine them there, by putting a light inside, but admittedly such method was defective. The result was that the vessel put to sea with weak boilers, which seriously retarded her progress, and caused a greater coal consumption.

Another cause of delay was the unusually foul condition of the vessel's bottom, which was covered with grass and slime below her load line. This foulness had been accumulating for some ten months when the vessel sailed and helped to retard her progress. The usual time for cleaning the bottom was every nine months but on this occasion it was allowed to go longer.

Under the circumstances of this case, the vessel should be liable for the burned cargo. Hurlbut v. Turnure (D. C.) 76 Fed. 587; Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830.

I do not regard the fact of the vessel having obtained the surveyors' certificates of great importance, although admitted in evidence, by consent, as substitutes for the surveyors' testimony. The diligence required of vessels to enable them to claim the benefit of the Harter Act (Act Feb. 13, 1893, c. 105, § 2, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), with reference to due diligence, is diligence with respect to the vessel, not in obtaining certificates. If there had been actual diligence in this case of the proper kind, it is probable that there would not have been any necessity of resorting to the cargo as fuel.

Decrees for the libellants, with orders of reference.