### GEORGE A. MOORE & CO. v. EAGLE STAR & BRITISH DOMINIONS INS. CO., Limited, et al.

### THE C. S. HOLMES.

(District Court, N. D. California, S. D. March 18, 1925.)

No. 18068.

1. **Judgment** ⬡⟹715(3)—**Shipping** ⬡⟹121(1)—Judgment finding want of due diligence not conclusive.

There is a difference in the maritime law between failure of an owner to exercise due diligence to make his ship seaworthy, which requires him to see that those employed by him for the purpose exercise due diligence, and his actual fault and privity in her unseaworthiness, of which he is not chargeable if he employs competent men, and judgment finding want of due diligence is not conclusive in action on insurance policy of actual fault and privity.

2. **Insurance** ⬡⟹273—Marine policy insuring against liability for loss or damage to cargo held not to imply warranty of seaworthiness.

A policy, insuring a shipowner in respect to any liability incurred for "loss or damage to any goods which may arise from any cause whatever," does not imply a warranty of seaworthiness of the ship, which would practically make such provision ineffective.

3. **Insurance** ⬡⟹262—Where insurance was effected before loss policy is effective, though not issued until after loss.

Where a contract of insurance was made and the insured was notified that the insur-

ance was effected before a loss, the policy is effective, though not issued until after the loss, and the insured was under no duty to notify the insurer of the loss before issuance of the policy.

In Admiralty. Suit by George A. Moore & Co., a corporation, against the Eagle Star & British Dominions Insurance Company, Limited, and others, on insurance policies covering the schooner C. S. Holmes. Decree for libelant.

Derby & Single, S. Hasket Derby, and Carroll Single, all of San Francisco, Cal., for libelant.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for respondents.

KERRIGAN, District Judge. This is a libel in personam by G. A. Moore & Co. against certain insurance companies upon three insurance policies, one issued by each respondent. The policies covered protection and indemnity against certain losses and liabilities incident to shipping on the schooner C. S. Holmes. In 1920 the Holmes was libeled at New Plymouth, New Zealand, for damages done to a cargo of benzine which had been shipped from San Francisco to New Zealand. The cargo owner secured a judgment against the ship in the New Zealand court, which judgment is made the basis for the present libel against the insurance companies.

The facts surrounding this shipment are very fully presented in the opinion of the New Zealand court. It appears that the benzine was stowed in a deck house which had been built upon the upper deck of the Holmes. When the cargo was unloaded at New Zealand, it was found that the case oil had suffered severe loss. An examination disclosed the presence of sea water in the deck house, which, of course, accounted for the rusted and damaged condition of the cases containing the benzine. This water had entered the deck house at some time during the voyage, and the water marks on the cases indicated that it had risen at times to the level of the second or third tier of cases. As the questions presented herein turn more or less on the drainage system which had been provided to carry off whatever sea water might enter the deck house, I will quote from that part of the opinion of the New Zealand court wherein these drains are described. "There are four of these (scupper drains), two on each side of the deck house. The design of each scupper drain is this: A hole is made in the main deck and another is made below the main deck in the inner skin of the ship. A pipe is then placed so as to connect the two. This is necessarily a curved pipe bending a little after leaving the main deck towards the ship's side. Water poured into the deck house would enter the orifice, and if unobstructed would at once flow down between the outer planking and the inner skin into the bilge and there be pumped out in the ordinary way. If everything was in working order, the exit of the water would be rapid and it could not rise high in the deck house." After discussing the evidence of the marine surveyors who examined the cargo on its arrival at New Zealand, as well as the evidence of the marine surveyors who had issued certificates of seaworthiness at San Francisco, the court stated: "The only conclusion that I can draw from the evidence as a whole is that the scuppers as a system proved inadequate. * * * The scuppers were designed to meet a certain amount of accidental obstruction, but they proved inadequate to meet what came."

A proper determination of this case may be had on a consideration of two of the questions presented by counsel. One of these, a question of law, is: "Is there an implied warranty of seaworthiness in a so-called P. & I. policy, such as is here sued on, and the second, a question of fact, is, "Was the Holmes unseaworthy with the actual fault and privity of the libelant." In passing, it may be said in connection with this latter point, that the libelant concedes that it cannot recover herein if the unseaworthiness was its actual fault and privity.

[1] I shall discuss these questions inversely to the order in which they have just been stated. The respondent insurance companies contend the New Zealand court expressly found that the Holmes was unseaworthy, and that the judgment embodies and rests upon an indispensably necessary finding that such unseaworthiness was with the actual fault and privity of libelant. They invoke the well-established principle that a valid judgment is conclusive between the parties and their privies, as to all questions of fact adjudicated. Unquestionably the New Zealand court found that the ship was unseaworthy when she left San Francisco, but I am of the opinion that it did not find that such unseaworthiness was with the actual fault and privity of the libelant, and that, further, such a finding was not necessary to support the judgment.

The shipowner had relieved itself of the absolute obligation to furnish a seaworthy ship by inserting the rather common provision in the bill of lading that—"The ship-

owner shall be responsible for loss or damage arising from any unfit state of the vessel when she sails on the voyage; but any latent defect in hull, machinery, equipment, or fittings shall not be considered unfitness or unseaworthiness; provided the same do not result from want of due diligence of the shipowner or of the ship's husband or manager." It is thus seen that the libelant would not have been liable to the cargo owner, unless it had failed to exercise due diligence to make the ship seaworthy. On familiar principles of law, it must be assumed, therefore, that the New Zealand court found that the unseaworthiness of the Holmes to carry the cargo of benzine arose either from obvious defects or from defects which libelant could have found and corrected by exercising due diligence. Practically these two propositions amount to the same thing, so we may say that a finding that the libelant had failed to exercise due diligence was absolutely necessary to support the judgment of the New Zealand court. But a shipowner may furnish an unseaworthy ship and not be charged with actual fault and privity of the unseaworthiness, even though he may have failed to exercise that due diligence which would relieve him from the obligation of furnishing a seaworthy ship. That is, there is a distinction between the terms "due diligence" and "actual fault and privity" as used in admiralty law. These terms have received judicial interpretation in connection with the Harter Act (27 Stats. at Large, 445 [Comp. St. §§ 8029–8035]) and the Limited Liability Acts (sections 4283–4286, R. S. [Comp. St. §§ 8021–8024]). Section 3 of the Harter Act provides: "That if the owner of any vessel * * * shall exercise due diligence to make the said vessel in all respects seaworthy * * * neither the vessel, her owner * * * shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel." (Comp. St. § 8031.)

The clause of the bill of lading above quoted is sanctioned by section two of the Harter Act, which provides that it shall not be lawful for the owner to insert a provision in the bill of lading by which its obligation to exercise due diligence is in any wise lessened, weakened, or avoided. Obviously the term "due diligence" is used synonymously in these two sections of the act. It has been held, where the owner sought to avail himself of the benefits of section 3 of the Harter Act, that a shipowner does not exercise due diligence by merely furnishing proper struc-

ture and equipment, for the diligence required is diligence to make the ship in all respects seaworthy, and that means due diligence on the part of all the owners' servants in the use of the equipment until the voyage is commenced. In other words, the owners must show that those whom they employed to act actually used due diligence. International Navigation Co. v. Farr & Bailey Manufacturing Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830. On the other hand, the phrase "actual fault and privity" has been judicially defined in connection with the limited liability acts, which allow limitation of liability to the value of the offending ship for certain losses where the fault which gave rise to the liability was without the owners' privity or knowledge. In decisions construing these statutes, it has been held that an owner is without actual fault and privity where he has engaged competent men to inspect or supervise certain work, and a loss occurs through the negligence of such employees. The Anna Faxon, 75 F. 312, 21 C. C. A. 366.

Applying these principles to the instant case, we find that if the unseaworthiness arose from the negligence of those in actual charge of the ship (i. e., by failing to properly clean the deck of debris before storing the oil, etc.), or from the negligence or inefficiency of those intrusted with the work of constructing the deck house and installing the scupper drains, the shipowner would be liable to the cargo owner, notwithstanding the due diligence clause of the bill of lading. And, further, if the unseaworthiness arose from any of the causes just stated, the shipowner would not necessarily be charged with actual fault and privity. Certainly, under the Faxon Case, supra, he would not be so charged, where he had engaged experienced and competent men to do the specified work. A finding that the ship was unseaworthy with the actual fault and privity of the libelant was, therefore, not necessary to support the judgment of the New Zealand court, and as there is nothing in the opinion intimating that the court believed such to be the fact, I see no reason for implying such a finding into the judgment. The libelant's manager did not personally inspect or supervise the construction of the deck house, or the loading of the ship, so the case does not fall within the doctrine of The Republic, 61 F. 112, 9 C. C. A. 386. His testimony was that he believed the ship was seaworthy, but such belief was undoubtedly founded on the reports which he had received from the captain, who supervised the construction of the deck house,

as well as the marine surveyors who examined the ship. These men believed that the ship was seaworthy. There is no showing that the libelant's manager possessed the necessary experience which would enable him to determine whether or not the ship was seaworthy to carry benzine, and unquestionably it would require a skilled person to determine this question. I believe that under all the circumstances the reports of the men who supervised the construction of the deck house, as well as the certificates of the marine surveyors who examined the ship, are sufficient to disprove actual fault and privity of the libelant, even though such certificates would not be conclusive if the question was whether or not due diligence had been used to make the ship seaworthy. Compagnie Maritime Francaise v. Meyer, 248 F. 881, 160 C. C. A. 639; The Abbazia (D. C.) 127 F. 495. These cases hold that the due diligence required is due diligence to make the ship seaworthy, not due diligence in securing surveyors' certificates. But these certificates and reports are certainly evidence that the libelant's manager did not rely upon his own judgment as to the seaworthiness of the ship.

[2] The respondents contracted to insure, protect, and indemnify, "if the assured shall become liable to pay and shall pay any sum or sums in respect of any responsibility claim, demand, damages and/or expenses, or shall incur any other loss." The enumerated perils include, "loss or damage to any goods which may arise from any cause whatever." Without going into the origin and purpose of P. & I. coverage, and avoiding any elaborate comparison of such a policy with an ordinary marine insurance policy, I think that for the purpose of this decision it is sufficient to point out that if a warranty of seaworthiness was implied into this policy, it would mean that in practically every instance the insurance company had assumed no risk, because, generally speaking, a ship is not liable to the cargo unless it is unseaworthy. Under the Harter Act, the ship is not liable to the cargo unless (1) it fails in proper loading, stowage, custody, or care of cargo; or (2) unless it is unseaworthy. Cargo improperly loaded, stowed, or ventilated, as a matter of law, renders the vessel unseaworthy. Obviously such a construction is to be avoided; otherwise, libelant would have paid premiums to no avail. Even if it be true that cargo claims form but a small part of a P. & I. coverage, the same reasoning applies, because it must be assumed that a proportionate part of the premium is paid to cover each specified risk. We should go far to avoid a construction which would render this particular clause meaningless. The English case of The Argo (Carmichael v. Liverpool Sailing Shipowners' Mutual Indemnity Association, VI Asp. Mar. Cas. p. 130) supports this view. In that case the port through which the cargo was taken on board was not closed tightly, and as the port was below the water line, some water leaked in. The defect in the joint was due to the negligence on the part of persons employed by the ship. The water which thus leaked in damaged part of the cargo in the lower hold, and the ship in consequence became liable to pay compensation to the cargo in respect to the damage. The shipowner, a member of the Association of Shipowners, sued the association on the articles of association by which the members agreed to indemnify each other against losses, damages, and expenses arising from or occasioned by any loss or damage of or to any goods or merchandise caused by "improper navigation of the ship carrying the goods for which any member might be liable." The court held that the loss occurred through improper navigation and allowed recovery to the shipowner. It has been held that commencing a voyage with a port hole opened, or improperly caulked, not only renders the ship unseaworthy, but also amounts to a failure to exercise due diligence to make the ship seaworthy. International Navigation Co. v. Farr, supra; Dobell & Co. v. Steamship Rossmore Co., 2 Q. B. 408. The Argo being as matter of law unseaworthy when she commenced her voyage, and the articles of the shipowners' association being analogous to a protection and indemnity policy, this case is authority for the view that there is no warranty of seaworthiness in a protection and indemnity policy.

[3] All the policies here sued on were actually issued after the loss had occurred and one of them was issued after libelant had received notice in San Francisco that the Holmes had been libelled for cargo damage. The policies, however, were antedated to a date prior to the loss, and on the record as here made it may be fairly assumed that the insurance was effected as of the earlier date. If the usual practice of issuing coverage slips was followed, undoubtedly such was the fact. In any event, I am of the opinion that the facts of this case bring it within the language of the court in El Dia Insurance Co. v. Sinclair, 228 F. 833, 143 C. C. A. 231, where it is said: "The policy in the case at bar is not shown to be in any way affected by fraud. Neither the insured nor the insurer's broker have practiced any

fraud whatever upon the insurer or its agents. It is true that after the fire occurred and prior to the issuance of the policy the insured gave no notice of the loss. But the failure to do so is explained. The general manager of the insured said that prior to the fire he had been informed by his brokers that the insurance had been secured, and that he was waiting to get the policy, which had not been issued. Surely, under the circumstances, he was not called upon to say anything. In Joyce on Insurance, vol. 1, § 108 (1897), it is said that: 'There is no legal nor moral obligation resting on the assured to voluntarily notify the company of a loss occurring after the risk has attached, although the policy has not been delivered nor the premium paid.' " Here the brokers informed the libelant's manager, before the Holmes arrived in New Zealand, that the insurance had been effected.

For the reasons above indicated, let a decree be entered for the libelant for the sum of $4,790.87, with interest thereon from the dates of payment of the several items thereof, and costs.