CARGILL GRAIN COMPANY v. CLEVELAND-CLIFFS STEAMSHIP COMPANY.[1]

February 20, 1931.

No. 28,060.

[1]Reported in 235 N. W. 268.

518

*Abbott, MacPherran, Dancer, Gilbert & Doan* and *Holding, Duncan & Leckie,* for appellant.

*Mitchell, Gillette & Carmichael,* for respondent.

LORING, J.

The plaintiff recovered a verdict for the sum of $28,275.05 for damages to a cargo of corn which was shipped on the defendant's steamer *Pioneer* from Milwaukee to Buffalo in the early part of the year 1928. The contract between the parties originated in correspondence. The defendant, for a compensation of three cents a bushel, agreed to store a cargo of corn for the winter in its ship *Pioneer* and deliver it to Buffalo upon the opening of navigation.

Pursuant to this arrangement the *Pioneer* was loaded with 350,073 bushels of No. 3 yellow corn and a bill of lading issued therefor. This loading occurred in the latter part of January, 1928, at the plaintiff's elevator at Milwaukee. Immediately after the loading the ship was moved to a berth across the channel from the plaintiff's elevator and remained there until early in May, 1928, when navigation opened upon the lake.

Before the ship left Milwaukee the hatches were opened, and it was found that the cargo was damaged by moisture and heat. When the ship arrived at Buffalo the extent of such damage was more fully determined. It appears to be conceded by both parties that the damage occurred before the ship left Milwaukee.

The *Pioneer* was what is known as a bulk cargo carrier, and its cargo-carrying space consisted of three holds separated from each other by bulkheads. These holds will be referred to as Nos. 1, 2, and 3, respectively, counting from the forward end of the boat. No. 1 and No. 3 holds had 10 hatches each, and No. 2 hold had 9.

At the forward end of No. 1 hold and the after end of No. 3·hold there were booby-hatches through which a man might descend into the cargo spaces under No. 1 and No. 29 hatches, respectively. Aside from these booby-hatches there was no way of ventilating the holds except by opening the hatch covers, since bulk carriers on the Great Lakes, being largely used for the carriage of coal and iron ore, are not equipped with mechanical ventilation for the cargo holds. After the cargo was loaded, the 29 hatches were covered with telescoping steel hatch covers, then with tar paper, and lastly with two thicknesses of tarpaulin, battened down.

The hatch covers were not opened during the winter, and the cargo was not ventilated except by the small amount of ventilation which resulted from the booby-hatches' being occasionally opened when on half a dozen occasions the plaintiff's representative went over to the boat and examined the grain under hatches No. 1 and No. 29. He always found the grain under these hatches in good condition.

The plaintiff alleged negligence of the defendant in "permitting said corn to become wet, damaged and heated, thereby sprouting, spoiling and damaging the same." It asserts that this allegation is supported by the evidence and that the damage resulted from lack of ventilation, which the defendant should have provided, from improper stowage by defendant, and from leakage due to failure on the part of the defendant promptly to remove snow from the ship's deck over holds 1 and 2 during the month of March when snowfalls occurred.

The defendant takes the position that the damage to the grain was due to its inherent vice, and that as a matter of law the record shows that the plaintiff cannot recover. The defendant also takes exception to various parts of the court's charge and contends that it is entitled to a new trial, if not to judgment notwithstanding the' verdict. From an order denying its blended motion for judgment or a new trial it has taken this appeal.

■ It seems to be conceded by both parties that the cargo should have been ventilated, and experts on both sides were of the opinion

that ventilation would have prevented the principal damage. That the corn which was ventilated by the occasional opening of the booby-hatches was not damaged strengthens the inference that the damage to the cargo was principally due to lack of ventilation.

In reviewing the sufficiency of the evidence to sustain the verdict the plaintiff is entitled to have the testimony taken in the light most favorable to it, and we must assume that all issues of fact have been determined in its favor. Our references herein to what the evidence showed must be understood not as our construction of it, but as our view of the facts and inferences the jury were justified in finding. The plaintiff introduced evidence to the effect that the corn was dry and in good condition for storage when it was loaded on the vessel, and expert opinion that, if it was out of condition on arrival at Buffalo, it was due to lack of ventilation, improper stowage, or the entry of moisture from the outside. The element of moisture in corn enters into the grade thereof, and this corn was No. 3 yellow, which is the grade which contains not over $17\frac{1}{2}$ per cent moisture. The expert evidence on the part of the plaintiff indicated that corn of that grade could be safely stored in bulk carriers if properly ventilated, and that such ventilation could be had by opening hatches, as many of the ships in the Milwaukee and Chicago districts did. One witness with long experience in such shipments said that such storage was "absolutely safe." We are therefore confronted at the outset with the question as to whose was the duty to ventilate the cargo.

The defendant realized that there was danger of moisture and heating of the corn, for on January 30, 1928, it sent a letter to plaintiff stating that there had been cases of damage to grain from moisture and heating and offering to allow inspection of the cargo by opening the hatches at plaintiff's expense. Mr. Cote, the plaintiff's superintendent at the Milwaukee elevator, went to the boat a half dozen times while it was lying in Milwaukee and descended to the cargo under the booby-hatches and found that part of the cargo was in good condition. He did not ask the defendant to open the regular hatches until the day the ship sailed for Buffalo, when the

cargo was found to be damaged. He claimed he had had no experience with winter storage in air-tight holds.

The defendant as bailee had the custody and control of the corn and, as its letter shows, was aware that it was likely to be damaged by moisture and heat. The corn could be provided with ventilation only by opening the hatches sufficiently to let air circulate over the various sections of the cargo. Was it the defendant's duty to do this? Perhaps the solution of this question can be approached by asking another. If there had been mechanical ventilators on the boat, whose duty would it have been to operate such ventilators in order to protect the cargo? Defendant, as bailee for hire and custodian of the corn, knew its propensity to become moist and to heat when closely confined. Having a crew on the ship and being paid compensation for storage and transportation, we believe that under such circumstances sound logic would hold the defendant responsible for the ventilation. Was defendant in any better situation on account of the lack of convenient ventilators? It was furnishing the ship for the specific purpose of housing the grain for the winter. If it used a ship not equipped with cargo ventilators and which on that account was better adapted to hauling coal or iron ore in their appropriate seasons, we believe that its duty was plain and that ordinary care required it to adapt its ship to the storing of grain by opening hatches for ventilation just as ordinary care would have required it to open mechanical ventilators had the ship been so equipped. The instrumentalities which could afford ventilation and the appliances for opening them were within its exclusive control; and, had the cargo been its own, doubtless the defendant would have taken the reasonable precaution of opening the hatches. The fact that the operation of ventilating by means of opening steel hatches is somewhat more expensive than in case of wooden hatches or mechanical ventilators does not change defendant's duty. It used steel hatches for its own convenience; possibly they had their advantages in the carriage of ore or coal. Defendant's letter of January 30 indicates that it fully appreciated the consequences of not ventilating the cargo. It was its duty to

use reasonable care to ascertain the propensities of the cargo and to act accordingly, as we shall presently point out. In our opinion it was defendant's duty, and not plaintiff's, to supply proper ventilation for the cargo. Townsend v. Rich, 58 Minn. 559, 60 N. W. 545; *The Arakan* (D. C.) 11 F. (2d) 791.

The defendant contends that it was relieved of such duty by the visits of Mr. Cote to the boat during the storage period and his failure to request the opening of the hatches. This defense was not pleaded, and no instruction was requested upon this theory. We are therefore forced to the conclusion that the point is now raised for the first time. Moreover this court is of the opinion that such conduct is not a bar to the plaintiff's recovery and that at most it was a circumstance to be considered by the jury in passing upon the question of negligence. Certainly the bailee by merely writing a letter like that of January 30 could not transfer its duty and the expense of ventilation to the bailor. Rice, Robinson & Witherop v. Western N. Y. & P. R. Co. 3 I. C. Rep. 162, 169.

The defendant contends that the propensity of grain to sweat and heat when not ventilated is an inherent vice and that it is relieved from liability for loss due thereto. The rule of inherent vice is usually resorted to to relieve a common carrier from the strict rule of liability as an insurer, but it does not follow that it is a complete defense. The carrier is still bound to exercise ordinary care to protect the cargo from loss. 1 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 1332, 1333; 4 R. C. L. p. 729, § 201. If in the case at bar reasonable diligence would have dictated the opening of hatches and so would have prevented the sweating and heating, the defendant, either as a warehouseman or private carrier, was bound to do so. It knew of the propensity and of the danger. The same rule of ordinary diligence applies to the analogous situation of loss by act of the public enemy. The carrier cannot supinely sit by and negligently permit the capture of its cargo; it is still under the obligation to exercise reasonable diligence to prevent the loss. Holladay v. Kennard, 12 Wall. 254, 20 L. ed. 390. So that the whole matter is reduced to the question of whether or not defendant showed itself

free from negligence in connection with the ventilation, stowage, and removal of snow.

The matter of stowage is involved to some extent with the question of ventilation because adequate ventilation would doubtless have overcome the faults in stowage. The evidence supported plaintiff's contention that the defendant was in control of the stowage. It is true that plaintiff had control of the grain until it left the spout; but the port captain in charge of the ship and the trimmers in his employ moved the ship and controlled the placing of the load in the vessel. They loaded hold No. 2 higher between the arches than elsewhere, thus leaving a more restricted air space above the cargo. Here was the greatest damage, due principally to lack of ventilation. In the after hold, where the grain was not piled so high as in No. 2, there was no appreciable damage. The corn in that hold still graded No. 3 at Buffalo. The evidence was such that the jury was justified in finding that ordinary care was not used by the defendant in stowage. Even if the plaintiff did the stowing, it was done in the presence of and without objection by the defendant's captain. We are of the opinion that for its own protection it was the defendant's duty to see that the corn was properly stowed, or to so conduct itself thereafter as to protect the corn, as stowed, from the hazards due to the manner of stowage. Reasonable care on its part demanded as much. Hannibal & St. J. R. Co. v. Swift, 12 Wall. 262, 20 L. ed. 423. In fact the rule seems to be that proper stowage is included in the implied warranty of seaworthiness which the United States courts regard as unqualified and not to be limited to the exercise of reasonable care. Corsar v. J. D. Spreckels & Bros. Co. (C. C. A.) 141 F. 260.

The plaintiff's third contention is that there was evidence of leakage through the hatches, which added to the damage to the corn. This leakage is attributed to failure of the defendant's crew in charge of the boat to remove snow from the hatches over No. 1 and No. 2 holds, in which substantially all the damage occurred. According to some witnesses, pools of water were seen to stand on the tarpaulins after these snows had melted, and there were streaks or

marks on the structure of the vessel, which together with the character of the damage warranted an inference that some part of the damage was caused by leakage due to failure to remove the snow. The snow was shoveled off No. 3 hold, where no damage occurred. *The C. W. Elphicke* (C. C. A.) 122 F. 439, 441.

The defendant complains that the court's charge cast upon it the burden of proving itself free from negligence causing the plaintiff's loss. The court followed the rule applied to warehousemen in Rustad v. G. N. Ry. Co. 122 Minn. 453, 456, 142 N. W. 727, 728. This court, speaking through Justice Dibell, said:

"This court has held that the burden of proof is upon the bailee to prove that he exercised the degree of care required of him. Davis v. Tribune Job Printing Co. 70 Minn. 95, 72 N. W. 808. Considerations of fairness put upon the warehouseman the burden of proving his own freedom from negligence. The goods are intrusted to him. He has charge and control of them. He determines the manner of keeping them. He is in possession of such evidence as there is as to the circumstances attending the loss. The bailor trusts the warehouseman and has no proof. It is not unjust to the warehouseman to require him to sustain the burden of proving its freedom from negligence. Where the burden of proof should rest 'is merely a question of policy and fairness based on experience in the different situations.' Wigmore, Evidence, § 2486. We hold that when the liability of the carrier has become that of a warehouseman and the loss of the goods shipped is established, the burden of proof is upon it to show its freedom from negligence. *This burden is not merely the burden of going forward with the evidence, nor a shifting burden, but a burden of establishing before the jury absence of negligence.* So far as the case of Geo. C. Bagley Ele. Co. v. American Express Co. 63 Minn. 142, 65 N. W. 264, which involves a liability of a carrier as a warehouseman, like the case at bar, states a different rule, it is disapproved. The rule now stated is entirely fair. It is a practical working rule and the only one."

We think that the rule is not changed if the defendant here be considered a private carrier instead of a warehouseman. The logic

of the situation leads to the same conclusion. If anything it is stronger as against the private carrier. Nor is the rule changed by the fact that the complaint sounds in tort; the reasons for the rule are just as compelling and we do not follow the courts which change the rule as to burden of proof in a suit sounding in tort from that prevailing in one based upon the contract of bailment.

■ The matter of inherent vice we have already discussed. At the outset of the charge the court fully stated the defendant's contention to be that it was not liable because the damage suffered was due to inherent vice in the cargo. It instructed the jury that the defendant was not liable as an insurer and was not responsible for the damaged condition in which the corn arrived at Buffalo unless such condition was due to defendant's negligence. This was sufficient to relieve defendant of any liability for damage due to the propensities of the corn unaccompanied by negligence on its part. At least seven times in the course of the charge the court instructed the jury that lack of ordinary or reasonable care was the basis upon which the defendant could be held liable if at all. With these instructions we do not apprehend that the jury could have had the wrong impression of the law.

■ The defendant also takes exception to the court's charge that if lack of proper ventilation caused the damage the defendant was responsible. The general aspects of the defendant's duty to ventilate we have already discussed. The defendant objects particularly to the words "properly" and "proper." These words doubtless came into the charge from their use in the opinions in certain federal cases arising in admiralty. Following the exact language of opinions is a practice accompanied by some danger of error, but in this case we are of the opinion that the use of the words complained of could not be misinterpreted by the jury, and that from the rest of the charge they must have understood that reasonable care with regard to ventilation was what was required. Palon v. G. N. Ry. Co. 129 Minn. 101, 151 N. W. 894.

■ Error is assigned on two paragraphs of the court's charge relating to the warranty of seaworthiness as to the ship and as to

the cargo to be transported, and one paragraph relating to the defendant's "absolute duty" to stow the cargo in such a manner as to render the ship seaworthy as to the cargo.

The defendant throughout the case has contended that the contract with the plaintiff was one for affreightment and not for storage. It was doubtless in view of that contention that the court gave the three paragraphs mentioned. The defendant complains that the implied warranty is not that the ship shall be fit but that it shall be "reasonably" fit for the carriage of the particular cargo. That is probably true, but the warranty of reasonable fitness is unqualified. Reasonable care or even the highest degree of care may be exercised to make a vessel reasonably fit, but that alone does not satisfy the warranty if it is not reasonably fit. *The Edwin I. Morrison,* 153 U. S. 199, 210, 14 S. Ct. 823, 38 L. ed. 688. We think that the omission of the word "reasonably" in these circumstances comes within the rule of Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754, and we further believe that it cannot have misled the jury in view of the numerous times that the court charged that reasonable care was the measure of defendant's duty. The word is frequently omitted by the courts in discussing the warranty. Corsar v. J. D. Spreckels & Bros. Co. (C. C. A.) 141 F. 260, 264; *The Edwin I. Morrison,* 153 U. S. 199, 210, 14 S. Ct. 823, 38 L. ed. 688; *The Carib Prince,* 170 U. S. 655, 662, 18 S. Ct. 753, 42 L. ed. 1181. As pointed out, the rule of reasonable care was more favorable to defendant than it was entitled to in regard to any duty covered by the implied warranty of seaworthiness. The defendant contends that plaintiff did not claim any breach of implied warranty, but the question of the vessel's suitableness or seaworthiness for the particular cargo was constantly at issue. Unseaworthiness is not confined to faults or omissions in the construction of the vessel but may arise out of a fault in the conduct of defendant in relation to the vessel and its equipment, which in this case would include the proper manipulation of the hatches to afford ventilation. International Nav. Co. v. Farr & Bailey Mfg. Co. 181 U. S. 218, 225, 21 S. Ct. 591, 593, 45 L. ed. 830. In that case a porthole was left open

prior to the commencement of the voyage in an otherwise properly constructed ship, and damage resulted. The court held that this was unseaworthiness chargeable to the owner.

The court said:

"We do not think that a ship owner exercises due diligence within the meaning of the act by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship *in all respects* seaworthy, and that, in our judgment, means due diligence on the part of all the owner's servants in the use of the equipment before the commencement of the voyage and until it is actually commenced."

In the case at bar the defendant sealed the ship in such a manner that the cargo was likely to be damaged if hatches were not subsequently opened. We see no difference in the principle to be applied here from that where a vessel owner leaves a porthole open to the injury of the cargo. The reasoning in the Farr case, 181 U. S. 218, 21 S. Ct. 591, 45 L. ed. 830, seems to us applicable to the case before us rather than that in *The Silvia,* 171 U. S. 462, 19 S. Ct. 7, 43 L. ed. 241, where the porthole was expected to be covered in case of bad weather.

On the point that the implied warranty of seaworthiness includes proper stowage of cargo, there seems to be no dispute in the cases in so far as seaworthiness of the ship to meet the perils of the sea is concerned. The house of lords takes the view that that is the limit of the implied warranty as it relates to stowage. Elder, Dempster & Co. v. Paterson, Zochonis & Co. 93 L. J. K. B. 625. Our own federal cases extend the warranty to stowage as it affects the safety of the cargo itself. *The Arakan* (D. C.) 11 F. (2d) 791; *The Willfaro* (D. C.) 9 F. (2d) 940. This latter doctrine appears the more logical to us. Likewise the warranty as to stowage applies whether the shipment is in a general ship or, as in the case at bar, where one shipper contracts for the entire cargo space. Carver, Carriage of Goods by Sea (7 ed.) § 22.

While the correctness of the court's charge on these aspects of the case might be sustained by these authorities, we believe that

the charge taken as a whole rests the liability of defendant on want of ordinary care and that these paragraphs were given to enlighten the jury on the obligations of the defendant with regard to which it was to exercise that degree of care. The charge taken as a whole would be so understood. It will be observed that the court instructed specifically that ordinary care was the measure of its liability with regard to stowage and handling of the cargo.

■ Further complaint is made that there was error in the charge relative to defendant's duty to use reasonable diligence to ascertain the propensities of the corn and to exercise ordinary care with reference to the stowage and handling in accordance with such knowledge. The admiralty courts use this rule. *The Willfaro* (D. C.) 9 F. (2d) 940, affirmed in Williams S. S. Co. v. Wilbur (C. C. A.) 9 F. (2d) 622. See also Southern Pac. Co. v. Walker-Smith Co. (Tex. Civ. App.) 257 S. W. 347; *The Arakan* (D. C.) 11 F. (2d) 791. The rule appeals to us as being sound, and in this case we have the further fact that the defendant by its letter of January 30 showed that it was aware of the characteristics of grain cargoes. It also gave a bill of lading for the cargo as "#3 Yellow Corn," which indicated the moisture content.

*The Willfaro* (D. C.) 9 F. (2d) 940, involved a shipment of fish meal, which heated on account of poor ventilation, which in turn was due entirely to the manner of stowage. The shipowner set up that the heating was due to inherent vice for which it was not liable. The court held that it was the duty of the shipowner to ascertain and consider the nature and characteristics of the cargo and to exercise due care in its handling, including the adoption of such methods as the nature of the cargo required.

■ It is claimed by the defendant that the Harter act, 27 St. 445, 46 USCA, §§ 190-195, applied and that the failure to ventilate was a fault in management of which that act relieved the defendant. We agree with the trial court that the Harter act did not apply until the voyage commenced. The damage here occurred before that and during the period of winter storage. Gilchrist Transp. Co. v. Boston Ins. Co. (C. C. A.) 223 F. 716; International Nav.

Co. v. Farr & Bailey Mfg. Co. 181 U. S. 218, 225, 21 S. Ct. 591, 45 L. ed. 830.

This case was not without its difficult problems for the trial court, but in our opinion they were handled fairly and justly to both parties and we find no reason which demands a new trial. The three simple elements entering into the charge of negligence were covered in the instructions in a manner which the jury must have clearly understood involved reasonable care as a measure of conduct, in the light of the duties which the law imposed upon the defendant under its contract for winter storage and carriage. The evidence supports the resulting verdict.

The order appealed from is affirmed.

[1]Reported in 235 N. W. 267.