**ERIE & ST. LAWRENCE CORPORATION v. BARNES–AMES CO.**

District Court, W. D. New York.

Aug. 27, 1931.

Stanley & Gidley, of Buffalo, N. Y., for libelant.

Bigham, Englar, Jones & Houston, of New York City, and Brown, Ely & Richards, of Buffalo, N. Y. (Andrew J. McElhinney, of New York City, and John B. Richards, Laurence E. Coffey, and David S. Jackson, all of Buffalo, N. Y., of counsel), for respondent.

ADLER, District Judge.

This is an action to recover contribution in general average for the losses and expenses incurred resulting from the stranding of the motorship I. L. I. 105, on Fraser's Shoal in the St. Lawrence river on June 30, 1927. The libelant is the owner of the vessel, and the respondent is the owner of the cargo which was laden at Buffalo for transportation to Montreal.

The motorship left Buffalo June 27, 1927, with a cargo of about 61,200 bushels of wheat. At about 12:35 o'clock p. m., on June 30th, it passed through the lift lock at Cardinal, Ontario, and proceeded down the St. Lawrence river. Skillful pilotage and frequent use of the wheel is necessary through this channel in which there is a current of about eight miles an hour. When the vessel arrived off Lotus Island, where it was proceeding with a swing to port, it was necessary to reverse and turn the wheel and the rudder completely over to starboard. The captain of the vessel, Powers, an experienced St. Lawrence pilot, was at the wheel at this time. He testified that at the critical moment when the wheel had to be put clear over to starboard he felt that he was losing pressure on the wheel. The vessel refused to respond and sheered to port in the heavy current. As the vessel was a twin-screw steamer, an attempt was made to steer the vessel with the engines, or "rather to kick her into safety" by working the starboard engine full astern and the port engine full ahead. This did not bring results, and both engines were then worked full astern and the anchors let go. The vessel was, however, rapidly carried down stream out of the channel on to Fraser's Shoal. The vessel was unable to release herself. Tugs were summoned, and, when it was found that they could not pull the vessel off, a quantity of the cargo was lightered. The vessel was pulled clear and the lightered cargo reloaded. Shortly thereafter the vessel grounded again on the outer point of Fraser's Shoal. It was necessary to lighter further cargo, and the vessel was finally released and proceeded to Montreal on July 6th. A

very small amount of cargo was lost during the lighterage operations, and the major part of the expenses incurred were incident to the lightering and dragging the boat off of Fraser's Shoal where it twice grounded.

It is the theory of the libelant that the disaster was due to the captain's faulty navigation of the boat. If that is determined to be the cause of the disaster, the libelant is entitled to recover in general average. It is the theory of the respondent that the disaster was due to faulty steering apparatus which failed to function at a critical point in the navigation of the vessel in the rapid current of the St. Lawrence river. If the libelant knew or should have known of the faulty or imperfect steering gear, and if the libelant permitted its vessel to proceed on the voyage with a steering gear imperfect or unsuited to the waters through which the vessel must pass on its trip, the vessel was unseaworthy when it broke ground and the libelant cannot recover in general average.

The vessel was equipped with a telemotor steering gear manufactured by the American Engineering Company of Philadelphia. A large number of vessels are equipped with this type of steering apparatus. The evidence is that probably 90 per cent. of the ocean-going vessels use it. A great many lake-going vessels use it, but there is no evidence in this case that any other vessels than those belonging to the fleet owned by libelant used it in navigating the waters of the St. Lawrence down to Montreal. The telemotor system proper is that part of the steering apparatus forward of the engine room. It may be called hydraulic steering. The turning of the wheel to starboard presses on the water in the pipe on the starboard side and that pressure actuates the valves farther back which set in motion the machinery that moves the rudder to starboard. When the wheel is moved to port there is the same pressure on the column of water in the pipe line on the port side with the effect that the rudder is moved over to port. It is necessary for the certain and efficient operation of this system that the columns of water on either side of the wheel be equal. There is introduced therefore in the pilot house a by-pass valve which is a part of the telemotor system. The action of the by-pass valve on this ship was not automatic, and, in order to equalize the columns of water on either side, this valve had to be operated by the wheelman. The instructions of the manufacturer were that this by-pass valve should be frequently operated to keep the columns of water equal. It is not disputed that a leaky by-pass valve would seriously affect the operation of the telemotor system.

The respondent's contention is that the by-pass valve on this telemotor system leaked, and that at a critical time the telemotor system failed and the steering gear did not work. That this was the cause of the disaster.

The first question to be determined is what caused the disaster. Was it a defective steering gear or was it faulty navigation by the captain of the vessel?

A careful examination of the testimony and exhibits has convinced me that the cause of the disaster was the failure of the telemotor steering apparatus to work efficiently at a critical time. I will not enumerate the bits of testimony and the evidence of different kinds, the sum of which has led me to this conclusion. The testimony of the captain that he felt that he was losing pressure on the wheel and his efforts immediately made to steer with the engines would alone seem to be sufficient to justify that conclusion. The captain's testimony in this regard was not changed, although, on the trial some years after the accident, he attempted to modify it. An analysis of the testimony discloses that the telemotor gear on this ship had frequently given trouble, and on certain specified occasions was out of order. I find that the disaster was not due to faulty navigation of the ship.

I will now consider the question of whether the libelant exercised due diligence to make the vessel seaworthy in every respect and particularly with reference to the steering gear.

Seaworthiness is to be determined when the ship breaks ground and is measured by her fitness in all respects to fulfill the purposes of the voyage as then contemplated. The Steel Navigator, 23 F. (2d) 590 (C. C. A. Second Circuit). Seaworthiness is further determined upon the facts and circumstances in each particular case. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830.

In this case the vessel was inspected before breaking ground at Buffalo, and the steering apparatus was tested. The method of testing the steering apparatus was described by the vessel's officers. From their testimony it appears that that part of the steering apparatus back of the telemotor system proper was carefully tested with a trick wheel. Just what was done in the way

of testing the telemotor forward of the engine house does not so clearly appear. It was not tested under pressure as it was claimed by respondent's witnesses it should have been in order to disclose leakage in the system. I have concluded that this examination of the steering apparatus was not careful or complete enough to relieve the libelant of its responsibility of a failure of the steering gear to function properly during the trip, under all the circumstances of this case. The test that was here made of the steering apparatus was not sufficient if it was a usual or ordinary test. In this case it should have been a searching test, as that word is used in the authorities. The Alvena, 79 F. 973, 974 (C. C. A. Second Circuit). This must be so on account of facts which I will briefly refer to in connection with the steering apparatus on this ship.

When the vessel left Buffalo for Montreal on its first trip of the season in April, 1927, trouble in the telemotor steering apparatus developed immediately. The vessel put into the harbor of Charlotte with its steering apparatus completely out of order and unworkable. Machinists came from Buffalo and an expert came from the Philadelphia factory where the telemotor was made. They evidently concluded that the trouble was a leak in the by-pass valve. This was taken out and sent to Buffalo to be ground and repaired. At the same time an order was sent to Philadelphia for a new one. The new one arrived, but was of a somewhat different pattern and did not fit. The old one was brought back from Buffalo and reinstalled. This same by-pass valve continued in the vessel throughout the remainder of the season. There is evidence from the logs of the vessel which are in evidence that there was some trouble with the telemotor system at intervals. On the fourth trip of the vessel that season, on June 8, 1927, three weeks before the disaster which occurred on the sixth trip, there was a leakage in the valve reported, and it was taken out at Montreal and braized. The testimony of the captain and of the engineer is that they kept constant watch over the telemotor system and frequently equalized it by use of the by-pass valve. After the disaster the by-pass valve was taken out and examined again. The vessel then proceeded from Montreal to Ogdensburg, and when it reached Pillar Bay trouble was again had with the telemotor system which was manifested by loss of pressure on the wheel. Later, when the vessel was laid up at Ogdens-

burg, the telemotor steering system was taken out and a straight shaft gear was installed in its place. With this history of the telemotor gear on this ship, the burden of a searching inspection is laid strongly on the libelant.

It is a question if the duty of the libelant does not go even further than that. A case rather remarkably in point is The European reported in volume 10, Probate Division, page 99. There the vessel's owner was held to be negligent under the following facts: The European was being steered through the River Thames by means of a patented steam steering apparatus. Suddenly some derangement of this steam steering gear occurred and her engines were stopped and reversed, but she ran into another boat before she could be stopped. The court states in the opinion that a similar difficulty had arisen on the preceding voyage, and that the machinery had been taken out, examined, and put back. The court held that, despite the fact that there was evidence in the case that some five hundred "steam quartermasters," as they are called, had been supplied to different ships, and that they had generally worked well and without developing the defect under consideration, in view of the failure of the machinery a few days before, the trusting of the ship to the selfsame apparatus in the crowded and intricate navigation of the Thames was negligence. The rule laid down in The European is stated in 18 English Ruling Cases, 627.

In the instant case we have the failure of the telemotor steering apparatus during the first trip of the season, the taking out and repairing it at Charlotte, the supposed cause for the failure being a leaky by-pass valve, the failure to install a new by-pass valve; and another recorded failure of the telemotor system on the fourth trip not long before the disaster. Applying the reasoning of The European, we may go so far as to hold the libelant negligent in intrusting his ship to the control of that particular steering apparatus in the rapid currents of the St. Lawrence river.

I find that the libelant did not prove due diligence and did not prove actual seaworthiness at the time of the commencement of the voyage.

The libel is dismissed.

If this opinion be deemed an insufficient compliance with Admiralty Rule 46½ (28 USCA § 723), findings and conclusions may be settled on notice.