**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30876

_____

USINAS SIDERUGICAS DE MINAS GERAS, SA - USIMINAS;
USIMINAS IMPORTACAO E EXPORTACAO, SA - USIMPLEX

                                    Plaintiffs-Appellants,

versus

SCINDIA STEAM NAVIGATION COMPANY, LTD., in personam;
JALAVIHAR M/V, in rem

                                    Defendants-Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana

_____

July 17, 1997

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    While executing a routine turning maneuver in the Mississippi, the JALAVIHAR was grounded, destroying her steering mechanism. The owner of the JALAVIHAR, Scindia Steam Navigation Company, Ltd., declared a general average event and filed the present claim against the cargo owners, Usinas Siderugicas de Minas Geras, SA and Usiminas Importacao e Exportacao, SA (hereinafter referred to collectively as Usiminas), for contribution. The district court found that a general average event occurred and found for Scindia.

Usiminas brings this appeal claiming that this judgment was in error. We AFFIRM the judgment of the district court.

On March 7, 1994, the JALAVIHAR was docked at the Electro-Coal facility on the east bank Mississippi River, bow into the current and starboard side against the dock. After loading some coal owned by Usiminas, she was to depart the Electro-Coal facility, turn, and proceed to a nearby anchorage to await Usiminas' instructions regarding her next loading port. At the time that the JALAVIHAR was ready to depart the Electro-Coal facility, there was a group of barges moored on the west bank slightly downstream of the Electro-Coal facility. Another ship was moored slightly downstream on the east bank which had a crane barge alongside it. The pilot testified that because of this second ship, the turn would have to occur some distance from the east bank or else the JALAVIHAR would be pushed downstream into the second ship. At the time the pilot commenced the maneuver, visibility was limited and had been reduced to zero by the time the JALAVIHAR was turning.

The turn was to be executed with the assistance of two tugs, the SANDRA KAY and the BILLY SLATTEN. The pilot testified that he told the tugs that initially the SANDRA KAY would be attached by a line to JALAVIHAR's port bow and would be pushing the vessel against the dock, and the BILLY SLATTEN would be on her port stern, without a line, pushing the JALAVIHAR towards the dock. After the lines attaching the JALAVIHAR to the dock were cast off, the SANDRA KAY would pull the JALAVIHAR's bow away from the dock with the current keeping her parallel to the dock. While the SANDRA KAY was pulling the JALAVIHAR away from the dock, the BILLY SLATTEN would

move to the starboard bow. After the JALAVIHAR was about 200 feet from the dock, the BILLY SLATTEN would move in between the JALAVIHAR and the dock and push her away from the dock and the SANDRA KAY would move back to the port stern to push it towards the dock, turning the JALAVIHAR around. The pilot also testified that he informed the master of the maneuver, but the master testified that he was not told of the specifics of the turning procedure.

As visibility was limited and getting worse, the master posted the chief officer as lookout on the JALAVIHAR's bow and put the duty officer in charge of monitoring the radar. The chief officer was also in charge of making sure the crewmembers on the bow unfastened the lines which attached the JALAVIHAR to the dock and to the SANDRA KAY. The duty officer was in charge of carrying out engine orders given by the pilot and entering them in the ship's log. The master testified that he also was monitoring the radar, as well as walking around with the pilot.

All went as planned until the JALAVIHAR began to move away from the dock. At that time, the pilot radioed the BILLY SLATTEN and asked the tug whether there were any lines on the bow. The captain of the BILLY SLATTEN radioed back that he didn't know because he was stand by on the port stern. The pilot radioed back that he should have been stand by on the starboard bow and that he should move there immediately. The BILLY SLATTEN complied but in the time it took to move to the starboard bow, the JALAVIHAR had drifted further than anticipated toward the west bank and the barges.

4

Despite the unexpected drift, the JALAVIHAR continued its maneuver as planned. The pilot testified that he was aware of the location of the barges on the west bank and that he knew that the turn was going to be close but that at all times he thought the JALAVIHAR would clear the barges. The JALAVIHAR did in fact contact the barges and shortly thereafter ran aground, destroying her steering mechanism and necessitating the unloading of the cargo.

Scindia, the owner of the JALAVIHAR declared the grounding a general average event, and demanded contribution from Usiminas. Usiminas refused, and Scindia instituted the present suit. The district court found that the cause of the accident was a miscommunication between the pilot of the JALAVIHAR and the captain of the BILLY SLATTEN. The district court also found that the voyage of the JALAVIHAR had commenced at the time it left the dock and therefore any subsequent events did not render it unseaworthy and that Scindia exercised due diligence to render the JALAVIHAR seaworthy before beginning its voyage. The district court also rejected Usiminas' assertion that the accident was caused by Scindia's failure to require the master to discuss the maneuver with the pilot, post an adequate lookout, monitor the radar sufficiently, and maintain the anchor in a condition of readiness.

II.

The principle of general average provides that losses for the common benefit of participants in a maritime venture be shared

5

ratably by all who participate in the venture.[1] Pacific Employers Insurance Coverage v. M/V Capt. W.D. Cargill, 751 F.2d 801, 803 (5th Cir.), cert. denied, 474 U.S. 909 (1985). A vessel owner at fault is not able to collect a general average contribution from the cargo owner. Gilmore & Black, The Law of Admiralty 266 (2d ed. 1977).

The contract between Usiminas and Scindia, however, included a "New Jason Clause," which requires general average contribution even if the carrier is negligent unless the carrier is found liable under the Carriage of Goods by Sea Act.[2] COGSA provides immunity to a carrier where the damage was caused by an error in navigation or management, but not for damage caused by unseaworthiness unless the carrier exercised due diligence to prepare the vessel for its voyage. Once a carrier has shown that the accident was caused by an error in navigation or management, it is entitled to general

---

[1]The parties have stipulated that if the accident is declared a general average event, Usiminas will pay $185,659.67 plus costs and interest, and if Usiminas prevails, Scindia will pay $208,754 plus costs and interest.

[2]The JALAVIHAR was chartered by Vale do Rio Doce Navegacao S.A. Docenave and subchartered to Usiminas. The "New Jason Clause" was included in the charter agreement between Docenave and Scindia and incorporated into the subcharter between Docenave and Usiminas. The clause reads in part:

> In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which or for the consequence of which, the Owner is not responsible by statute, contract, or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred in respect of the goods.

average unless the cargo owner shows that the vessel was unseaworthy and that the unseaworthy condition was a concurrent cause of the accident. Once unseaworthiness and causation have been established, the burden shifts back to the carrier to demonstrate the exercise of due diligence in preparing the vessel for departure. Deutsche Shell Tanker Gesellschaft v. Placid Refining Co., 993 F.2d 466 (5th Cir. 1993).

Usiminas challenges the district court's holding on three grounds. First, Usiminas claims that the district court applied the wrong burden of proof structure and instead it should have applied the rule of The Pennsylvania, 86 U.S. 125 (1873). Second, Usiminas claims that any error in navigation that causes damage to a vessel prior to the commencement of a voyage should be considered a lack of due diligence and therefore the vessel owner is not entitled to general average. Third, Usiminas claims that the district court erred in finding that none of the alleged unseaworthy conditions caused the grounding of the JALAVIHAR. We consider these arguments in turn.

A.

Under the rule of The Pennsylvania, a vessel in violation of a statute bears the burden of showing not only that the violation did not cause the damage, it could not have. We decline to apply the rule of The Pennsylvania in this case, where COGSA clearly provides the burden of proof structure.

The Pennsylvania provides a burden of proof structure for causation in maritime incidents. In California & Hawaiian Sugar

7

Co. v. Columbia S.S. Co., Inc., 391 F.Supp. 894 (E.D. La. 1972), affd., 510 F.2d 542 (5th Cir. 1975), however, the district court held that the rule of The Pennsylvania does not apply where COGSA provides the burden of proof structure.   Id. at 898; see also Director General of India Supply Mission v. The S.S. Maru, 459 F.2d 1370, 1375 (2d Cir. 1972)(rejecting the rule of The Pennsylvania where COGSA provides the burden of proof), cert. denied, 409 U.S. 1115 (1973).  We affirmed that decision under the burden of proof in COGSA.  We decline to deviate from the holding in California & Hawaiian Sugar Co. in this case and allocate the burdens of proof in this case according to the scheme set out in COGSA.

## B.

The district court found that Scindia had established that the accident was caused by navigational or managemental error, an excepted cause under COGSA, which therefore created a general average event.  The district court then turned to Usiminas' argument that the accident was also caused by the unseaworthiness of the JALAVIHAR.  Because a vessel owner's duty to provide a seaworthy vessel only applies prior to the commencement of the voyage, the district court addressed the question of whether the voyage had begun.  The district court found that the voyage had commenced at the time the vessel left the dock.  Further, the district court held that even if the unseaworthy conditions proffered by Usiminas caused the accident, that Scindia carried its burden of showing due diligence prior to the voyage.

8

Usiminas asserts that the district court erred in finding that Scindia had proven navigational or managemental error. Usiminas claims that the voyage had not commenced and that navigational or managemental errors that occur before the commencement are best viewed as a failure of the carrier to exercise due diligence. Under this view, COGSA would only except navigational or managemental errors that occur after the voyage has commenced.

We see no reason to restrict the navigational error exception to errors occurring after the commencement of a voyage. We therefore agree with Scindia that COGSA excepts navigational errors regardless of whether they occur before or after a voyage commences and do not reach the question of whether a voyage had commenced in this case. Usiminas' argument against this proposition relies upon language from this court's opinion in Louis Dreyfus Corp. v. 27,946 Long Tons of Corn, 830 F.2d 1321 (5th Cir. 1987). The shipbuilder who constructed the Louis Dreyfus improperly installed a valve position indicator system. The system had two devices to indicate whether the valve was open or closed: a light and a mark on the shaft that actually opens and closes the valve. Incorrect readings from this faulty system caused an engineer to flood the engine room which caused damage while the vessel was still docked. The district court found that the improper indicator system rendered the Louis Dreyfus unseaworthy and that the ship owner had not exercised due diligence to discover the problem by detecting it during construction, docking, or at the time the engineer flooded the engine room. On appeal, the ship's owner claimed that the

9

engineer's negligence in flooding the engine room resulted from managemental error and was therefore excepted under COGSA.

The Louis Dreyfus court rejected this argument, citing International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 226 (1901), and determined that "[t]he word 'management' is not used without limitation, and is not, therefore applicable in a general sense as well before as after sailing." Based on this principle, the Louis Dreyfus court held that "[b]ecause the critical error of the engineer in this case occurred before the commencement of the voyage, [the ship owner] is not shielded from liability by § 1304(2)(a)." Id. at 1328. Usiminas urges that this language in Louis Dreyfus means that any error in management or navigation that occurs before the commencement of a voyage is not excepted error under COGSA.

We interpret Louis Dreyfus to stand for the proposition that a failure of the ship owner and its employees to detect a manufacturing flaw, if it occurs before the commencement of a voyage, is best viewed as a failure to exercise due diligence, and not an error in management. There is a fine line between actions that constitute errors in management and inaction that constitutes a lack of due diligence and the Louis Dreyfus court found that the timing of the engineer's action best qualified it as a lack of due diligence.[3] Indeed, the Supreme Court case relied upon by the

---

[3]Similarly, the other case relied upon by Usiminas for the proposition that error that occurs before the commencement of a voyage is unexcepted error considered an error in management, not an error in navigation. See American Mail Line Ltd. v. United States, 377 F.Supp. 657 (W.D. Wash. 1974).

10

*Louis Dreyfus* court only considered managemental error occurring prior to the commencement of a voyage. *International Navigation Co.*, 181 U.S. at 226. In contrast, this case presents the question of whether an error in navigation which occurs when a vessel is shifting from a dock to a temporary anchorage is an excepted cause under COGSA.

Scindia claims that this court should look to the prior case of *Mississippi Shipping Co. v. Zander*, 270 F.2d 345 (5th Cir. 1959), *vacated as moot*, 273 F.2d 618 (5th Cir. 1960), in deciding whether the district court could find navigational error occurred prior to the commencement of the voyage. The vessel in *Mississippi Shipping*, while departing, hit the dock it was attached to and developed a hole in its hull. The hole was not discovered until two ports later, when the crew found that water had destroyed some of the vessel's cargo. The cargo owners in *Mississippi Shipping* conceded that the hole in the vessel was caused by negligent navigation of the vessel, an excepted cause. However, they argued that a concurrent cause of the cargo damage was the ship owner's failure to exercise due diligence to discover and repair the hole before commencing the voyage. The ship owner's duty to exercise due diligence only applies prior to the commencement of a voyage. On appeal, therefore, the issue had been distilled to whether the voyage had commenced at the time the ship hit the dock. The court found that the voyage had commenced and that therefore any failure to discover and fix the hole could not be characterized as a lack of due diligence.

Prior to its discussion of the commencement of the voyage, the *Mississippi Shipping* court noted that both parties had agreed that the hole was caused by negligence in the navigation of the vessel. The parties had both conceded that, "unlike the former days of the Harter Act when its Section 3 error in management exception was confined to events occurring after the commencement of the voyage, Cogsa's Section 4(2)(a) is now unconditional both as to due diligence and point in time." Id. at 348 (citations omitted)(citing Isbrandtsen Co. v. Federal Insurance Co., 113 F. Supp. 357 (S.D.N.Y. 1952), affd. per curiam, 205 F.2d 679 (2d Cir. 1953), cert. denied, 346 U.S. 866 (1953)). The *Mississippi Shipping* court then went on to consider the result of the case if the cargo had been immediately damaged by the inrush of water, and noted that "the Section 4 defense would have been absolute whether the ship was deemed to be on her voyage, making ready for her voyage, or simply undocking preparatory to commencing her voyage." In other words, the *Mississippi Shipping* court expressed an opinion on the resolution of the issue presently before this court.

*Mississippi Shipping*'s consideration of the issues presented here is dicta, however, we find its reasoning persuasive and adopt its approach and resolution to the present issue. Usiminas seeks to have this court declare that any navigational error that occurs prior to the commencement of a voyage results from a lack of due diligence to make a ship seaworthy. COGSA's exception for navigational or managemental error, however, is not restricted to navigational errors occurring after the commencement of a voyage.

12

The plain language of the statute excepts the carrier for liability from damage caused by "[a]ct, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."  46 U.S.C. § 1304(2)(a).

The Mississippi Shipping court used the example of immediate damage from navigational error to contrast the problem that arises when a vessel has a latent defect prior to the commencement of a voyage.  That court was faced with the latter question, which it addressed by finding that the voyage had commenced at the time the defect was incurred and therefore the failure to detect and repair the defect could not be attributed to a lack of due diligence.  The court in Louis Dreyfus directly faced the issue of whether a failure to detect a latent defect is an error in management or a failure to exercise due diligence.  The Louis Dreyfus court found that failure to detect a latent defect is best characterized as a lack of due diligence.  This is not the situation we are faced with here.  Damage from the navigational error was immediate and no time for discovery lapsed.  Therefore, the damage to the vessel was not caused by a failure to detect the damage but by the navigational error itself.

The only court to have ruled on the issue of whether navigational error prior to the commencement of a voyage is excepted error was the court in Isbrandtsen Co. v. Federal Ins. Co., 113 F.Supp. 357 (S.D.N.Y. 1952), affd. per curiam, 205 F.2d 679 (2d Cir. 1953), cert. denied, 346 U.S. 866 (1953).  In Isbrandtsen, the vessel had fully loaded and moved to a temporary

anchorage before departing the port. While moving, the vessel stranded and had to be refloated and repaired. The cargo owners admitted that the stranding was caused by navigational error but argued that the voyage had not commenced and therefore the vessel owner could not take advantage of the navigational error exception to COGSA. The Isbrandtsen court rejected this argument, stating that "[t]he exception of the carrier and ship for loss or damage arising from negligence or default of the master, mariner, pilot, or servant of the carrier in the navigation or management of the ship is unconditional in [COGSA]." Isbrandtsen, 113 F.Supp. at 358.

We agree with Isbrandtsen and Mississippi Shipping that navigational error that occurs prior to the commencement of a voyage is excepted under 46 U.S.C. § 1304(2)(a). Any error by the pilot, therefore, was properly construed by the district court as navigational error. This court has noted that responsibilities of a pilot are broad and encompass, "the command and navigation of the ship." Avondale Ind. v. International Marine Carriers, 15 F.3d 489 (5th Cir. 1994). We therefore find that the district court in this case did not err in finding that Scindia bore its burden of establishing navigational error.

C.

Once the carrier has established navigational or managemental error as a cause of the accident, the burden shifts to the cargo owner to prove that a concurrent cause of the accident was an unseaworthy condition. The carrier will then be afforded an

14

opportunity to show that it exercised due diligence in preparing the vessel for its voyage. In this case, the district court found that the ship was seaworthy when it left the dock and that even if there was an unseaworthy condition, it was not a concurrent cause of the grounding and Scindia exercised due diligence in preparing the ship for its journey. Therefore, Usiminas may only prevail on appeal by proving that the district court erred in finding that Scindia exercised due diligence to make the JALAVIHAR seaworthy and that an unseaworthy condition was a concurrent cause of the grounding.

The district court determined that no unseaworthy conditions existed because the voyage had commenced, however, it also found that none of the conditions asserted by Usiminas as evidence of unseaworthiness were causally related to the grounding. Because we uphold the district court's finding that the alleged unseaworthy conditions did not contribute to the grounding, we decline to reach the issue of whether the voyage had commenced. Usiminas claims that the JALAVIHAR was unseaworthy in three respects: 1) the posted lookout had duties in addition to lookout and therefore was not a competent lookout; 2) there was not a dedicated radar monitor; and 3) Scindia company policy does not require the master to discuss routine turning maneuvers with the pilot.[4]

---

[4]On appeal, Usiminas has dropped its contention that the JALAVIHAR was unseaworthy because her anchor was not ready to be dropped. The district court found that the order to drop anchor occurred after the ship had grounded and Usiminas has not challenged this factual finding.

15

Usiminas initially argued that the master's failure to discuss the maneuver with the pilot was an unseaworthy condition which caused the grounding. Scindia, however, correctly states that in Avondale Ind. v. International Marine Carriers, 15 F.3d 489 (5th Cir. 1994), a panel of this court found that the master's failure to adequately discuss the maneuver constituted negligence on the part of the master. Any negligence of the master concerning the movement of the vessel would be considered a navigational or managemental error, not an unseaworthy condition. Usiminas' response to this argument is that Scindia's lack of a company policy requiring the master to discuss routine maneuvers with the pilot constitutes an unseaworthy condition. First, however, Usiminas must show that the district court was incorrect in rejecting a failure to discuss as a cause of the grounding of the JALAVIHAR.

The district court found that in the time it took the BILLY SLATTEN to shift its position, the JALAVIHAR drifted too far towards the west bank to facilitate the turn and therefore the accident was caused by a miscommunication between the pilot and the BILLY SLATTEN. Usiminas claims that the master was aware of the actual position of the BILLY SLATTEN at all times and that if he was aware of the intended position of the BILLY SLATTEN, he would have been able to inform the pilot that it was out of position. The pilot testified that he discussed the position of the tugs with the master. The master testified that he did not discuss the position of the tugs with the pilot before the maneuver, however,

16

he did testify that at the time of the maneuver he was aware that the BILLY SLATTEN should have been stand by at the starboard bow. Under these circumstances, the district court did not err in finding that Scindia's lack of a policy requiring the master to discuss routine maneuvers with the pilot caused the accident. At the critical moment, the master was aware of the intended position of the tugs and that the BILLY SLATTEN was improperly positioned. Prior discussion would have given him no more information than he had at the crucial moment.

Usiminas has also not shown that the district court erred in finding that the lack of a dedicated lookout and radar monitor were concurrent causes of the accident. The district court found that at all times the pilot was aware of the position of the barges and that he thought the turn was going to be successful. His opinion was seconded by the captain of the BILLY SLATTEN. Radar and visual observation would have given him no more useful information than he already had. As we uphold the district court's findings that none of the conditions that allegedly rendered the JALAVIHAR unseaworthy were concurrent causes of the grounding, we need not address Usiminas' contention that the district court erred in finding that Scindia exercised due diligence in preparing the JALAVIHAR for her voyage.

### III.

For the foregoing reasons, we find that the district court correctly found that the damage to the JALAVIHAR was caused by an excepted COGSA error. Scindia may therefore recover in general

17

average pursuant to the New Jason clause in its contract with Usiminas.  The judgment of the district court is affirmed.

AFFIRMED.