UNITED STATES of America,

v.

John DOE # 1, Defendant.

No. 98 CR 438(RLC).

United States District Court,
S.D. New York.

Aug. 23, 1999.

Mary Jo White, U.S. Attorney for Southern District of New York, New York City (Joshua Berman, John Hillebrecht, Assistant U.S. Attorneys, of counsel), for U.S.

Ruth Liebesman, New York City (Ruth Liebesman, of counsel), for Defendant.

### OPINION

ROBERT L. CARTER, District Judge.

The United States of America (the "government") has charged defendant John Doe # 1 ("John Doe"), a male who at the time of his arrest had not reached the age of eighteen, with eleven acts of juvenile delinquency, including murder, attempted murder, robbery, racketeering, assault, and distribution of and possession with intent to distribute crack cocaine and heroin in a superceding juvenile information. Now before the court is the government's motion to transfer John Doe to adult status pursuant to 18 U.S.C. § 5032.

### BACKGROUND

The charges against John Doe stem from his alleged involvement in the 165th Street Organization (the "165 Organization"), a criminal organization that operates in New York, New Jersey, and Pennsylvania. John Doe and ten co-defendants are charged with a host of violent acts and acts relating to narcotics trafficking in an indictment filed May 13, 1998. Specifically, John Doe is charged with acts of juvenile delinquency occurring between 1994 and June 19, 1996, including the March 15, 1995 murder of an individual named Francisco Soto.

On September 18, 1998, the government moved for transfer John Doe to adult status, asserting that transfer was appropriate under the discretionary transfer provisions of 18 U.S.C. § 5032. At that time, the United States Attorney for the Southern District of New York certified, pursuant to authority delegated to her by the Attorney General of the United States, that the charged offenses include violent felonies and that there is a substantial federal interest in the case to warrant the exercise of federal jurisdiction. See 18 U.S.C. § 5032. After unsuccessful plea agreement negotiations, defendant filed his opposition papers on February 22, 1999, submitting inter alia a psychological evaluation.

By letter dated April 12, 1999, the government responded to the February 22 opposition papers. Additionally, the government moved for an adjournment of the transfer hearing, then scheduled for April 21, 1999, in order to permit the filing of a superceding juvenile information. By letter dated April 14, 1999, defendant objected to the government's reply as untimely, and as raising issues that should have been briefed in the initial motion for transfer.

In a conference that same day, the court granted the government's motion for adjournment and gave defendant permission to file a sur-reply due May 3, 1999. The court also directed the government to obtain its own psychological evaluation of John Doe, which was ultimately submitted on May 17, 1999.

In a letter dated May 28, 1999, the government argued for the first time that the transfer of John Doe to adult status is required under the mandatory transfer provision of 18 U.S.C. § 5032. Defendant responded by letter dated June 3, 1999, contending that transfer is not mandatory under the statute, and that in any case, the government had waived a mandatory transfer motion by failing to move for such a transfer in its initial papers.

The hearing to determine whether transfer is appropriate under either the mandatory or discretionary provisions of 18 U.S.C. § 5032 was held on July 28, 1999. At the hearing, the court heard the testimony of Dr. Barry Rosenfeld ("Dr. Rosenfeld"), the psychologist who prepared the evaluation of John Doe for the government, and Dr. Sanford Drob ("Dr. Drob"), the psychologist who prepared the evaluation for the defense.[1] Each witness was cross-examined by the other party. There were no other witnesses. On August 5, 1999, the government submitted a letter briefly addressing the availability of juvenile treatment centers within the Bureau of Prisons system generally, and in a particular corrections center proposed by defendant. The letter stated that after the hearing, the government had spoken to a psychologist who concluded that there are no juvenile treatment programs appropriate for John Doe within the Bureau of Prisons system. By letter dated August 6, 1999, defendant rebutted the government's assertions, and objected to the government's letter as an attempt to introduce the testimony of a witness not subject to cross-examination.

## DISCUSSION

At the outset, the court is compelled to comment on the government's dilatory conduct in its prosecution of the instant motion. The court is particularly dismayed by the government's repeated attempts to raise new issues and present evidence in an untimely manner. The government should not have taken months, for example, to file a superceding juvenile information nor to move for mandatory transfer. While the court's patience has certainly been tried by this behavior, the court will nonetheless proceed on the merits of the motion as defendant has not been prejudiced by the government's negligence and inexcusable delays.

### A. Mandatory Transfer

Section 18 U.S.C. § 5032 provides in relevant part:

a juvenile who is alleged to have committed an act after his sixteenth birthday which if committed by an adult would be a felony offense that has as an element thereof the use, attempted use, or threatened use of physical force against the person of another, or that, by its very nature, involves a substantial

---

1. The experts hired by the parties were not disinterested, and certainly did not give the appearance of being so either in their testimony or in their reports submitted to the court. The style of Dr. Rosenfeld's report, for instance, was more appropriate for a prosecutor's brief than for a clinical evaluation. While defendant's expert came across as more balanced in his report, when pressed by the government on cross-examination, Dr. Drob admitted that he had overlooked a contradiction in John Doe's statements. On an issue of this magnitude where disinterested-

ness is of paramount concern, *see also Breed v. Jones*, 421 U.S. 519, 535, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (noting that the possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile), it seems that there should be an established procedure that would provide for greater impartiality in the psychological evaluation of the juvenile. A better procedure may be for the court to appoint an expert from a list acceptable to both sides, or have both sides agree on one candidate for the court's approval.

risk that physical force against the person of another may be used in committing the offense, or would be an offense described in [the listed sections], and who has previously been found guilty of an act which if committed by an adult would have been one of the offenses set forth in this paragraph or an offense in violation of a State felony statute that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed, shall be transferred to the appropriate district court of the United States for criminal prosecution.

Therefore, transfer of a juvenile is mandatory if (1) the offense charged was committed after the defendant's sixteenth birthday; and (2) the offense charged would be a felony if committed by an adult; and (3) the offense charged either (a) involves the use, attempted use, or threatened use of violence or (b) by its very nature involves a substantial risk that violence may be used in committing the offense, or (c) is one of the offenses specifically enumerated in the statute; and (4) the juvenile was previously found guilty of a crime that would be a felony of the type described in (3) above if committed by an adult. *See also United States v. Juvenile Male # 1,* 47 F.3d 68, 69 (2d Cir.1995).

According to the probation report submitted by the government, John Doe was convicted as an adult on July 24, 1997 of attempted robbery in the first degree for an incident occurring on May 22, 1996, whereby he along with two others held an individual at gunpoint. Based on this conviction, the government argues that transfer of John Doe to adult status is mandatory. According to the government, a violent felony conviction that occurs at any time prior to the transfer

hearing is a predicate conviction under the mandatory transfer provision of § 5032. Defendant contends that he has not been "previously found guilty" because the robbery conviction occurred after the alleged conduct that is the subject of the current transfer hearing. The resolution of this dispute thus turns on an interpretation of the term "previously" in the mandatory transfer provision of 18 U.S.C. § 5032. This issue is evidently one of first impression in the Second Circuit, as well as in the other circuits.

Nevertheless, the court finds guidance in decisions considering similar language in the sentence enhancement provisions of the Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e) (the "ACCA"). *See also United States v. David H.,* 29 F.3d 489, 494 (9th Cir.1994) (stating that conclusion regarding § 5032 was required by the Ninth Circuit's interpretation of similar language in sentencing statute and guidelines). The ACCA provides that a defendant convicted of a weapons offense under 18 U.S.C. § 922(g) shall receive a minimum fifteen year sentence if the defendant "has three previous convictions by any court ... for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). As with § 5032, there is no guidance from Congress as to the meaning of the term "previous." [2]

In *United States v. Talley,* 16 F.3d 972, 975–76 (8th Cir.1994), the Eighth Circuit was confronted with the issue of whether a conviction that occurred after the date of the defendant's § 922(g) violation qualified him for sentence enhancement under § 924(e). Akin to its contentions in the instant case, the government in *Talley* argued that the convictions need only have occurred prior to defendant's sentencing

---

**2.** In contrast, § 4B1.2(c)(1) of the United States Sentencing Guidelines specify that in order for a defendant to receive an enhanced sentence as a career offender pursuant to Guidelines § 4B1.1, the defendant must have committed the instant offense of conviction subsequent to sustaining at least two prior

violent or drug-related felonies. *See also United States v. Williams,* 29 F.3d 172, 174 (4th Cir.1994) (holding that convictions sustained subsequent to the conduct forming the basis for the offense at issue could not be used to enhance defendant's sentence as a career offender pursuant to § 4B1.1).

for the § 922(g) violation. Similarly, the defendant in *Talley* contended that the district court could only consider convictions that occurred before the actual date of the § 922(g) violation.

The court began its analysis with the proposition that in determining the proper scope of a statute, a court must start with its plain language. *See id.* at 975 (citing *Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991)). The court also noted that, if unambiguous, the language of a statute "is ordinarily to be regarded as conclusive in the absence of a clearly expressed legislative intent to the contrary." *Id.* (quotation marks omitted). *See also Skubel v. Fuoroli*, 113 F.3d 330, 335 (2d Cir.1997). The court then found that the language of § 924(e) did not support the government's interpretation of "previous convictions" as those sustained at any time prior to sentencing: "If previous convictions meant those convictions a defendant had accumulated prior to sentencing, Congress could have omitted the word previous because, at sentencing, a district court could never consider convictions not yet in existence. Thus, adoption of the government's interpretation of previous convictions effectively would render the term previous superfluous." *Id.* at 975–76. Giving effect to every word and clause of the statute, *see Moskal v. United States*, 498 U.S. 103, 109–10, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990), the court held that the term "previous convictions" in § 924(e) referred to convictions that occur before defendant's violation of § 922(g).[3] *See id.* at 977. Moreover, while the government had pointed to general statements by legislators stating that the purpose of the statute was to incarcerate repeat offend-

ers, the court noted that the legislative history of § 924(e) did not "shed light on the intent of the legislature as to the temporal component of the words previous convictions in reference to the § 922(g) violation." *Id.* at 976. *See also United States v. Chartier*, 933 F.2d 111, 113–15 (2d Cir.1991) (recognizing that Congress' intent to enhance penalties for repeat offenders under career offender guidelines could support different interpretations regarding sequence of predicate convictions).

■ The court finds the reasoning in *Talley* to be instructive in defining the phrase "previously found guilty" under the mandatory transfer provision of § 5032. First, if as the government contends, the phrase "previously found guilty" refers to convictions sustained prior to the transfer hearing, Congress could have omitted the word because a court can never consider convictions not yet in existence at the time of the hearing, as the Eighth Circuit held in *Talley*. Thus, the reasonable interpretation of the phrase, and one that gives effect to every word and clause in the provision, is that the predicate conviction must occur prior to the conduct forming the basis of the offenses at issue. Second, the government's reference to the legislative history of the mandatory transfer provision is unavailing. While the legislators who enacted the provision did express the desire to prosecute repeat juvenile offenders as adults, there is no clearly expressed legislative history on the issue of the temporal relationship between the previous conviction and the conduct that forms the basis of the indictment. *See* S. REP. No. 98–225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3530–31. Accordingly, mandatory transfer is not warranted by

---

**3.** All other circuits that have considered the issue of the term "previous" under the ACCA have concurred with the holding in *Talley*. *See United States v. Richardson*, 166 F.3d 1360, 1361 (11th Cir.1999) (agreeing with Eighth Circuit's interpretation of "previous convictions" as the " 'only reasonable interpretation of the plain words of § 924(e).' "); *United States v. Hobbs*, 136 F.3d 384, 387 n. 3

(4th Cir.1998) (citing *Talley*); *United States v. Jefferson*, 88 F.3d 240, 243 (3rd Cir.1996). *See also United States v. Johnson*, 826 F.Supp. 439, 440–43 (S.D.Fla.1993) (finding 924(e) ambiguous, but holding, pursuant to the rule of lenity, that conviction occurring after 922(g) violation was not a predicate offense for the purpose of sentence enhancement).

§ 5032 in the instant case as John Doe's robbery conviction occurred subsequent to the alleged conduct giving rise to the present charges.[4]

### B. Discretionary Transfer

A juvenile who is alleged to have committed a crime of violence or an offense listed in the statute after his fifteenth birthday may be transferred to adult prosecution pursuant to § 5032 in the "interest of justice." *See also United States v. Nelson,* 68 F.3d 583, 588 (2d Cir.1995) ("Nelson I"). The district court is constrained to consider the following six factors in weighing a motion for transfer: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record;[5] (4) present

4. The Second Circuit has implicitly supported the court's holding in *United States v. Nelson,* 68 F.3d 583 (2d Cir.1995) ("Nelson I"). In *Nelson I,* the defendant entered a plea of guilty, as an adult, to aggravated assault and carrying a concealed weapon subsequent to the charged offense at issue in the transfer hearing. *See id.* at 586. The court stated, "The fact that the acts giving rise to these convictions took place after the date of the offense alleged in the case at bar does not alter the importance of considering these convictions on the transfer motion." *Id.* at 590. However, the court did not hold that the convictions required a transfer to adult status; rather, it noted, "Where a juvenile has committed serious adult offenses shortly after the alleged act of delinquency, a presumption may well arise that it would be a futile gesture to pursue juvenile proceedings." *Id.* While it is unclear whether the government moved for mandatory transfer in that case, the court finds, absent a clear mandate to the contrary, that the statements in *Nelson I* regarding the significance of post-offense convictions in juvenile transfer determinations indicate the Second Circuit's support for the holding here.

5. The Second Circuit has not yet defined the scope of the "nature and extent of the juvenile's prior delinquency record." In *United States v. Wilson,* 149 F.3d 610 (7th Cir.1998), the Seventh Circuit held that § 5032 allows the review of arrests as well as convictions. *See id.* at 613. The court also held, however, that the "government should not be allowed to hold minitrials, attempting to prove the underlying conduct in those instances where an arrest did not result in a conviction." *Id.* In *United States v. Juvenile LWO,* 160 F.3d 1179 (8th Cir.1998), the Eighth Circuit held that this factor does not encompass "evidence of incidents or behaviors, which could be of a delinquent or criminal nature, for which there has been no charge or a charge but no conviction." *Id.* at 1183. The court further stated, though, that the juvenile's alleged violations of the law could be admitted in the analysis of three other factors: "the juvenile's present intellectual development and psychological maturity," "the age and social background of the juvenile," and "the nature of past treatment efforts and the juvenile's response to such efforts." *See id.* at 1183 (noting that the "plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise . . . ."); *United States v. Anthony Y.,* 172 F.3d 1249 (10th Cir.1999) (citing *Juvenile LWO* ). *But see In re Sealed Case,* 893 F.2d 363, 369 n. 12 (D.C.Cir.1990) (stating that juvenile's alleged acts are "entirely unrelated" to those factors).

However, the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the "prior juvenile record" factor. *See United States v. John Doe,* 49 F.3d 859 (2d Cir.1995). In *John Doe,* the district court below had found that the extent and nature of the juvenile's prior delinquency record was somewhat inconclusive, as the record showed that he had no convictions, yet had been arrested twice. *See id.* at 868 (noting that the previous arrests "could not be considered a plus."). The court, in ruling that the trial court had not abused its discretion, dismissed the juvenile's contentions that the court had improperly discounted the evidence that he had no prior juvenile record as unpersuasive. *See id.* at 868–69.

Given the tacit approval by the Second Circuit of the district court's analysis in *John Doe,* the court will accept evidence of John Doe's arrests in analyzing the nature and extent of his prior delinquency record. However, the court also notes that consideration of the two arrests has little effect on its analysis of this particular factor. The court finds that this factor weighs in favor of transfer, regardless of the evidence of the two arrests, based on John Doe's robbery conviction.

With regard to evidence of incidents and behaviors that have not led to convictions and their relevance to the other factors, the court agrees with the Eighth and Tenth Circuits and will consider such evidence in its analysis of the "age and social background," "intellectual development and psychological maturity,"

psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032. While the court must consider and make findings on each of the six factors, it is not required to afford equal weight to each factor and may balance them as it deems appropriate. *See Juvenile Male # 1*, 47 F.3d at 71.

■ Permeating the transfer decision is the notion of rehabilitation, which "clearly is one of the primary purposes of the juvenile delinquency provisions." *Nelson I*, 68 F.3d at 590. *See also United States v. Nelson*, 90 F.3d at 636, 640 (2d Cir.1996) ("Nelson II") (noting that court's assessment of juvenile defendant's potential for rehabilitation is a crucial determinant in transfer decision). Accordingly, juvenile adjudication is presumed appropriate unless the government establishes by a preponderance of the evidence that prosecution as an adult is warranted. *See United States v. John Doe*, 49 F.3d 859, 868 (2d Cir.1995); *Juvenile Male # 1*, 47 F.3d at 71. The desire to encourage rehabilitation must be balanced against the "need to protect the public from violent and dangerous individuals." *Juvenile Male # 1*, 47 F.3d at 71.

### a. The Factors

#### 1) John Doe's age and social background

#### A) Age

John Doe, born on January 19, 1978, was ages 16 and 17 at the time of the offenses charged in the indictment. The most recent alleged act of juvenile delinquency occurred six months prior to defendant's eighteenth birthday. He is currently 21 years old.

and "past treatment efforts" factors. In doing so, the court will take care to "consider the nature of the particular factor and precisely how the alleged incidents, behavior,

### B) Social background

John Doe was raised in the Bronx, New York, as the youngest of three children. His parents, both natives of Puerto Rico, separated when he was three years old. Defendant stated that he and his siblings were raised by their mother, along with a half-sister from his mother's previous relationship. John Doe's grandparents live in Puerto Rico, but he reports not being close to them.

After his parents' separation, John Doe saw his father for a few hours at a time at least twice a month. During his visits, John Doe's father would usually give him money or buy him something, and then send him home. While the two went fishing together once, John Doe related that there was a lack of communication in his relationship with his father, and that they rarely spent quality time together. Defendant attributed his father's lack of involvement with him to his father's heroin abuse. As a result of his use of intravenous heroin, John Doe's father contracted HIV and currently suffers from AIDS. John Doe's relationship with his father has reportedly become closer since his incarceration.

John Doe's mother worked in factories for a number of years, and has recently begun working as a home health aide. The family also received Public Assistance because her income was inadequate. Defendant described his mother as hardworking and admirable, and reported that he rarely fought with her. He also stated that his mother's main objective was to keep him in school, but that he never discussed right and wrong, or drugs or sex with her. John Doe recalled two different boyfriends of his mother who lived with the family during his childhood. His contact with both of them was occasional, at best.

charges, and surrounding circumstances are relevant to that factor," *Juvenile LWO*, 160 F.3d at 1183–84, in order to minimize any undue prejudice to the juvenile.

Defendant denied any history of violence between his parents or between him and his mother's boyfriends. However, he did remember incidents where his mother was violent towards her boyfriends. John Doe also stated that his mother occasionally hit him with a belt or a broomstick when he misbehaved, but insisted that the beating were not abusive and denied suffering significant injuries as a result. Defendant also denied ever having run away from home, or being placed in a group or foster home. He did not report any incidents of sexual abuse.

John Doe recalled having been beaten approximately once a month by his older siblings during his childhood years. During one incident, his brother dislocated his arm in three different places. He also recalled occasional fistfights with his sister, often over which television programs they would watch. Defendant stated that he was afraid of his siblings, and complained to his father about the beatings. John Doe recalled that when he was eight, he called his father at work because his brother and sister had been hitting him. As a result, his father came to the house drunk, hit his sister with a belt, and beat up his brother. The physical abuse by his siblings eventually ended when John Doe was 13 years old. He described two incidents that led to the end of the abuse. In one incident, he broke his sister's nose during a fight over an expensive pair of pants. In the other incident, defendant and two friends attacked his brother in retaliation for stealing the television set and radio that he had been given as a reward for completing another grade in school.

John Doe stated that his brother was addicted to crack cocaine, and abused alcohol. His brother, according to defendant, has also been repeatedly incarcerated. John Doe's sister also abused alcohol and drugs, but he stated that he did not believe her to be an addict. Defendant reported that both his brother and sister were periodically thrown out of the home by their mother for stealing from the family in order to support their drug habits. John Doe also described his half-sister as a drug addict and alcohol abuser.

With regard to his own alcohol use, John Doe stated that he began drinking alcohol when he was approximately 13 or 14 years old, but that the use was quite limited. With regard to drugs, he described his use of marijuana as minimal during his childhood and adolescence. However, defendant acknowledged that he began using marijuana daily several months after he was incarcerated for his robbery conviction, and that this pattern continued for approximately nine months. John Doe denied ever having used crack, cocaine, or heroin.

Defendant described himself as relatively isolated during his childhood, and remembered only having one close friend. He stated that he was unpopular as a child, and that he was bullied by other children because of his shyness and clothes. John Doe did, however, recall having several girlfriends during his adolescence and early childhood, often maintaining two or more relationships simultaneously. John Doe also has a daughter, who is currently approximately three years old, with his last girlfriend before his incarceration. His girlfriend eventually ended the relationship when she found out that he had numerous girlfriends, and that he was using them to smuggle marijuana into Riker's Island while he was incarcerated there.

### 2) Nature of the offense alleged [6]

John Doe is charged with eleven acts of juvenile delinquency, including drug trafficking and various crimes of violence, in the superceding juvenile information. The charges arise from his reported involvement in the 165 Organization. One of the more serious offenses is John Doe's alleged participation in the robbery, kidnap-

---

**6.** For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment. *See Nelson I,* 68 F.3d at 589.

ing, and murder of Francisco Soto ("Soto"). Defendant allegedly shot and killed Soto, and attempted to murder another victim. Additionally, he has been charged with armed robbery and with assaulting an individual with a knife or sharp object.

### 3) Nature and extent of any prior delinquency record

As previously discussed, John Doe was convicted for attempted robbery in the first degree when he was eighteen. As part of this crime, he and two other individuals robbed an individual at gunpoint. John Doe was also arrested on two other occasions. There was no disposition reported for either of those arrests.

### 4) Present intellectual development and psychological maturity

### A) Intellectual development

John Doe reported that he was a good student in elementary and junior high school, but acknowledged that he had repeated the third and ninth grades. Defendant claimed that his attendance became poor by the seventh grade, and that he started receiving poor grades as a result of spending time with the "wrong crowd." Eventually, he dropped out of school before receiving his high school degree. However, since his incarceration, defendant has obtained his GED and an electrician's certificate.

On the WAIS–R, a standardized intelligence test performed by Dr. Drob, John Doe obtained a Full Scale IQ of 96 which placed him in the average range of intellectual functioning for individuals in his age group. Defendant's non-verbal IQ, however, exceeded his verbal IQ by 31 points. Dr. Drob attributed this unusual difference in scores as possibly a result of a mild learning disability and the interference of emotional issues that have hampered his academic learning. Dr. Drob also noted that defendant had received a perfect score on the Block Design subtest

of the WAIS–R, a score which is in the 99+ percentile. Based on John Doe's score on the Block Design test, Dr. Drob concluded that defendant has a high intellectual potential. The score also suggested that John Doe would be especially skilled at being an electrician, an area that John Doe reported as having excelled at in prison.

Dr. Rosenfeld did not perform an IQ test because the nature of the test precludes repeated assessments with the same instruments. However, he questioned the validity of Dr. Drob's results because Dr. Drob had used an older version of the WAIS–R. Moreover, with regard to Dr. Drob's ultimate conclusion of defendant's high intellectual potential, Dr. Rosenfeld asserted that the conclusion was overstated. Rather, he ascertained John Doe to have an approximately average intellectual functioning outside of his excellence in spatial organization. Dr. Rosenfeld acknowledged, however, that John Doe's performance on the test could have been hampered by his poor education and the cultural biases inherent in the test.

### B) Psychological maturity

Dr. Drob reported that the results of personality testing indicate that defendant is an immature and hyper-vigilant individual who has difficulties with interpersonal relationships and impulse control. Dr. Drob also stated that John Doe suffers from acute anxiety and marked personality dysfunction from his struggles with issues of self-esteem. Additionally, the results of the Thematic Apperception Test revealed defendant's preoccupation with receiving guidance from an older, wiser adult—a need which was fulfilled by defendant's association with Juan Ramirez. Dr. Drob attributed this need for guidance to the abuse from his siblings, the lack of meaningful contact with his father, and to the failure of his mother to speak to him about moral issues. Moreover, the results of the Gudjohnson suggestibility scale indicated that John Doe is easily influenced by oth-

ers. Lastly, Dr. Drob concluded that defendant does not suffer from a disabling psychiatric disorder, but has serious psychological difficulties that require counseling and psychotherapy treatment.

In contrast, Dr. Rosenfeld reported that the only symptoms that stood out in his mental examination of defendant was mild depression and anxiety that arose upon his incarceration for the current charges. While Dr. Rosenfeld identified John Doe as having an anti-social personality disorder, he also stated that defendant does not have significant symptoms of genuine psychological distress. With regard to his yearning for an older, male role model, Dr. Rosenfeld acknowledged that this need was fulfilled by defendant's association with Juan Ramirez. Dr. Rosenfeld also reported that John Doe claimed that he had been manipulated by Ramirez, and that he had largely performed criminal activities at Ramirez's request. However, Dr. Rosenfeld noted that defendant appeared to take pride in his accomplishments as a criminal, and that he had engaged in some violent and criminal activities, including the distribution of marijuana at Riker's Island, on his own initiative.

In addition, Dr. Rosenfeld criticized Dr. Drob's conclusions, contending that many of the personality tests utilized by Dr. Drob generated uninterpretable or meaningless data. According to Dr. Rosenfeld, the responses to Dr. Drob's tests revealed considerable exaggeration of defendant's current psychiatric and psychological symptoms. Dr. Rosenfeld concluded that John Doe appeared to be motivated by the desire to present himself as psychologically disturbed, quite likely for the purpose of eliciting sympathy in the hope of obtaining a favorable decision in this transfer determination.

Dr. Rosenfeld based this conclusion partly on the results of the Minnesota Multiphasic Personality Inventory test (the "MMPI"), a written questionnaire, that he performed on defendant. He re-

ported that John Doe had greatly exaggerated his symptoms in his responses to the MMPI, indicating that defendant was dishonest in reporting his psychological symptoms overall. However, at the hearing, Dr. Rosenfeld admitted that the results of the test were compromised by the failure of the prison to secure the testing situation. Dr. Rosenfeld testified that he had directed the federal agent not to return the defendant to custody until he had completed the test. However, contrary to his directions, John Doe was placed into custody with the test, presenting the possibility that other inmates had helped him with his responses.

### 5) The juvenile's response to past treatment efforts and the nature of those efforts

John Doe does not appear to have undergone any psychiatric or psychological treatment in the past. However, John Doe responded favorably to educational and vocational training programs at Green Correctional facility, where he obtained a GED and an electrician's license.

### 6) Availability of programs designed to treat the juvenile's behavior problems

In his sur-reply, John Doe identified the Federal Corrections Institution at Butner ("F.C.I. Butner") as a possible treatment center. F.C.I. Butner is an adult federal institution that has specialized group therapy programs and individual therapy, as well as vocational and educational courses. At the hearing, Dr. Drob also testified that he had spoken to a psychologist at F.C.I. Butner, and that the psychologist had affirmed the availability and appropriateness of F.C.I. Butner as a rehabilitative institution for defendant.

By letter dated August 5, 1999, the government contended that Dr. Drob had given erroneous testimony at the hearing. In the letter, the government stated that they had spoken to Dr. Benjamin Wheat ("Dr.

Wheat"), a psychologist at the Bureau of Prisons in Washington, D.C. According to the government, Dr. Wheat stated that there are no juvenile treatment programs in the entire Bureau of Prisons appropriate for John Doe. Dr. Wheat contended that John Doe would never be placed in a juvenile treatment program because prison administrators would be greatly concerned that the defendant, who is currently 21 years old, would pose a significantly negative influence on the true juveniles (i.e., those who are under 18 years old) in the program. As to F.C.I. Butner in particular, Dr. Wheat stated that the institution was not appropriate for the defendant as there is no juvenile treatment program there. Dr. Wheat also claimed that the Bureau of Prisons would never place John Doe at F.C.I. Butner due to the seriousness of the crimes that he has allegedly committed.

#### b. Analysis of the Factors

■ The court finds the following factors to weigh against the transfer of John Doe to adult status: his social background; his present intellectual development and psychological maturity; his response to past treatment efforts; and the availability of programs designed to treat his behavior problems. John Doe has clearly experienced a troubled and violent, if not abusive, childhood. The lack of a meaningful relationship with his father certainly contributed to his desire for a older, male role model—a need that was unfortunately met by his association with the 165 Organization and Juan Ramirez. Moreover, while his mother provided a positive influence in his life, defendant's numerous, physical altercations with his siblings created an unstable and violent family life.

■ Defendant's intellectual development and psychological maturity reflect his unstable environment. John Doe's intellectual development was stunted, evidently, by his yearning for a role model, and his subsequent involvement with Juan Ramirez. Furthermore, both experts testified to defendant's lack of maturity, impulsiveness, and anti-social behavior.[7] While there is some evidence that his psychological anxieties may have resulted from his incarceration and not from a previous condition, and that he gave inconsistent statements to Dr. Drob and Dr. Rosenfeld regarding his rehabilitative efforts after he learned that his girlfriend was pregnant with his child, the court nevertheless finds that defendant's immaturity, along with his lack of intellectual development, are factors that weigh against transfer to adult status. *See also United States v. J.D.,* 525 F.Supp. 101, 104 (S.D.N.Y. 1981) (Sweet, J.) (concluding that immaturity and lack of development weighs against transfer); *United States v. John Doe,* 710 F.Supp. 958, 961 (S.D.N.Y.1989) (Kram, J.) (same).

■ Another factor that weighs against transfer is defendant's positive response to the educational and vocational training programs available at Green Correctional Facility. Despite the government's untimely contention to the contrary, there appears to be programs available to treat defendant's problems. While the court has considered the statements of Dr. Wheat contained in the government's August 5, 1999, defendant correctly points out that Dr. Wheat did not directly address the issue of whether there are appropriate adult, rather than juvenile, facilities for John Doe. *See also United States v. Nelson,* 921 F.Supp. 105, 116–17 (E.D.N.Y.1996) (Trager, J.) (ac-

7. While the testimony of Dr. Rosenfeld regarding John Doe's psychological maturity was taken into consideration, the court notes that it was not accorded its full weight due to Dr. Rosenfeld's partial reliance on the MMPI results. As Dr. Rosenfeld testified, the test was severely compromised out of no fault of defendant. The court therefore did not consider Dr. Rosenfeld's conclusions, including those regarding John Doe's dishonesty and possible manipulation of these proceedings, to the extent that they derived from the MMPI test results.

knowledging that a defendant convicted under the Juvenile Delinquency Act, who is over the age of 21 at the time of conviction, may be placed in an appropriate program in an adult facility), *aff'd,* 90 F.3d 636 (2d Cir.1996). At any rate, the government has not carried its burden of persuasion on this factor, especially in light of the testimony by Dr. Drob that F.C.I. Butner is an appropriate and available institution. *See also Nelson I,* 68 F.3d at 591 (discussing government's burden of persuasion).

█ Nevertheless, after a careful weighing of the factors, the court concludes that transfer of John Doe to adult status is warranted in the interest of justice. In making this difficult decision, the court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant. First, defendant is charged with a host of serious crimes, including murder and other acts of violence, that arise out of his alleged involvement with a criminal organization. The nature of these crimes, and the fact that defendant has already been convicted of robbery, heightens the court's concerns about the threat to society posed by juvenile crime. *See also Nelson I,* 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors.").

Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior. While defendant emphasizes that he was under the influence of Juan Ramirez, there is evidence that he committed crimes on his own accord. The primary example is his participation in a drug smuggling and distribution operation at Riker's Island during his incarceration for his robbery conviction. Not only did he commit the crime independent of Ramirez, but he also risked jeopardizing his relationship with the mother of his daughter—the very relationship that he reportedly cares a great deal about. As rehabilitation is a primary purpose of the federal delinquency provisions, including § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted.

### CONCLUSION

For the reasons stated above, the government's motion for mandatory transfer is denied. The government's motion for discretionary transfer in the interest of justice is granted.

**IT IS SO ORDERED.**